UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHARLES SANTICH and<br><br>OLD DUTCH MUSTARD CO., INC.,<br>d/b/a PILGRIM FOODS, INC.,<br><br>Defendants. | No. 1:25-cr-00002-LM-TSM-01/02 |

UNITED STATES'S SENTENCING MEMORANDUM

The defendant, Charles Santich, is a habitual violator of state and federal environmental laws and regulations. Despite decades of effort by state and federal regulators to encourage the defendant and his company, defendant Old Dutch Mustard, to comply with the law, Santich refused to do so. Undeterred by years of administrative and civil enforcement actions, Santich doubled down and concocted an elaborate scheme to bury a pipe to covertly pump his company's manufacturing waste and contaminated storm and groundwater into the Souhegan River. In doing so, Santich used his position as the president and CEO of his company to conscript his employees and contractors into committing and concealing his crime. In the case of his employees, Santich made it known that they would be fired if they did not assist him. As for his contractors, Santich simply lied about the true purpose of the excavation and plumbing work needed to build the infrastructure for his illegal discharge operation. All the while, Santich and his company remained subject to state and federal oversight, and Santich abused his position of trust with those agencies to repeatedly lie under the penalties of perjury to execute and hide his crime. When caught, Santich lied (or had his employees lie) to state and federal investigators claiming that the residue from his illegal discharges was just a failed attempt at growing mustard plants.

For these and the below reasons, the government respectfully requests that the Court adopt

the parties' binding sentence regarding the company, and sentence Old Dutch Mustard to five years' probation, issue an order requiring that Old Dutch establish an effective environmental compliance program and environmental ethics program as a condition of probation, and impose a $1.5 million fine. The government also requests that the Court sentence Santich to 36 months' imprisonment—a sentence at the high-end of the applicable guideline range and the statutory maximum—and impose a fine of at least $500,000. This is a white-collar case in which both the criminal conduct and the defendant's history and characteristics demand a high-end sentence. Such a sentence is sufficient but not greater than necessary to achieve the purposes of sentencing and is especially needed in this case.

## I. BACKGROUND[1]

### A. Factual Background, Offense Conduct, and Relevant Conduct

On January 24, 2025, Santich and his company, Old Dutch Mustard, were charged by Information with multiple felony violations of the Clean Water Act arising from their intentional illegal discharges of acidic wastewater into the Souhegan River. On February 24, 2025, Santich pled guilty to illegally discharging his manufacturing waste from at least January 2020 through August 2023 and his company pled to three specific illegal discharges. (ECF No. 1; PSR ¶¶ 1-2.)

Santich's plea agreement requires that the government recommend a sentence within the guideline range and allows Santich to argue for a below guideline sentence. (ECF No. 2 § 6.) For its part, the company agreed to pay a $1.5 million fine and to a five-year term of probation that includes both an environmental compliance and ethics program. (ECF No. 3 § 6.) Nothing in the plea or in these programs "limit[s] in any way the EPA in obtaining information from Old Dutch

[1] The government presents this factual summary in support of its requested sentence and in accordance with its obligations under federal law, the Local Criminal Rules, and the plea agreements. *E.g.*, 18 U.S.C. § 3661; USSG § 1B1.3; LCrR 32.1; ECF Nos. 2, 3 ⁋ 5.

about the facility or pursuing administrative and civil regulatory or enforcement actions it deems appropriate to protect public health and the environment." (ECF No. 3 at 27.) Santich signed both plea agreements on January 16, 2025.

1. Old Dutch Mustard's Decades-Long History of Polluting the Souhegan River.

This case arises from Old Dutch's decades long history of undeterred pollution of New Hampshire's waterways. (PSR ¶¶ 7-14.) Santich's grandfather founded Old Dutch in Brooklyn, New York and, by 1984, it had consolidated its operations in New Hampshire. Old Dutch manufactured vinegar and mustard in a facility located in Greenville, generating two streams of wastewater. (*Id.* ¶ 7-8.) The first was manufacturing waste. The manufacturing process produced highly acidic (or low pH) wastewater. Much of this wastewater was vinegar that spilled or leaked during the manufacturing process and vinegar that did not meet specifications and was discarded as waste. (*Id.* ¶ 9.) The second wastewater stream involved contaminated ground and stormwater. The facility was old and leaky, and there had been innumerable spills of vinegar and intermediate products at the facility over the years, especially in the tank farm area adjacent to the manufacturing buildings. (*Id.* ¶¶ 9, 11.) This resulted in significant ground contamination such that water (including stormwater) that flowed through the Old Dutch grounds mixed with the vinegar in the ground and became contaminated and acidic. Both of these wastewater streams were to be treated as wastewater and not discharged into the environment. (*Id.* ¶¶ 9-12.)[2]

Old Dutch has a long history of Clean Water Act violations. Citizens have expressed concern about vinegar odors in the Souhegan River as far back as the 1980s and the Souhegan River experienced fish kills in the 1990s due to Old Dutch's pollution of the river, resulting in

[2] Old Dutch does not have an NPDES permit to discharge wastewater or such contaminated ground- and stormwater to any Water of the United States, including New Hampshire waterways like the Souhegan River. All such discharges are prohibited by the Clean Water Act.

enforcement actions by the New Hampshire Department of Environmental Services ("NHDES"). (*Id.* ⁋ 13; Santich PSR Add. at 10.) As the company's violations continued, beginning by at least 2004, the EPA, the United States Department of Justice, NHDES, and the New Hampshire Attorney General's office brought several additional enforcement actions to try to bring the facility into compliance. (*E.g.*, PSR ⁋ 13.)[3] In particular, the defendants have a long history of discharging acidic water into a stream (the "Unnamed Stream") that runs underneath and adjacent to the Old Dutch facility. This stream is a tributary to the Souhegan River and the defendants' discharges have caused environmental harm. (*Id.* ⁋⁋ 8, 11-14, 30-32; Santich PSR Add. at 10, 14.) As a result, compliance efforts have focused on the Unnamed Stream. (*Id.* ⁋⁋ 8, 12-14.)

Though Santich primarily lived in his Long Island home in New York, he had a second residence in New Hampshire about 20 minutes from the facility and, by 2009, inherited managerial responsibly of Old Dutch that included its environmental compliance. (*Id.* ⁋⁋ 12A, 70.) This required, among other things, that Santich comply with the company's stormwater permit and develop its Stormwater Pollution Prevention Plan (SWPPP).[4] In this role, Santich was the point of contact at the facility for regulatory officials and was required to provide accurate information to the EPA. For example, Santich was to provide site plans that identify all stormwater conveyances such as "ditches, pipes, and swales" and all stormwater outfalls; he also signed and certified Annual Reports that included, among other things, any incidents of noncompliance in the past year or that were ongoing. As laid out in greater detail below, despite holding this position of trust with regulators, Santich never identified the riprap ditch/swale, illicit pipe and discharge to the

[3] A 2004 Consent Decree entered by this Court required the payment of a $190,000 civil penalty and the implementation of both a third-party environmental compliance audit and an environmental management system.

[4] The stormwater permit is required by the Clean Water Act and authorizes the discharge of stormwater associated with industrial activity subject to limitations and conditions (conditions designed to minimize pollutants in the stormwater).

Souhegan River, and, among other things, falsely certified reports and other documents to conceal this information. (*Id.* ¶¶ 12A, 29; Santich PSR Add. at 2-7.)

Even after Santich took on the responsibility for Old Dutch's compliance, its environmental violations continued. As a result, state and federal regulators continued to take administrative and civil steps to try to get Santich and his company to obey the law. For example:

- In 2014, an EPA administrative action ordered Old Dutch to address low-pH stormwater and to install monitoring Sondes to monitor the facility's low-pH discharges to the Unnamed Stream. In response, among other things, Old Dutch identified its corrective actions to include collecting low pH waters in wastewater storage tanks and shipping them to the Rochester POTW. (PSR ¶ 13.)[5]

- In 2016, a New Hampshire Consent Decree required Old Dutch to, among other things, pay a civil penalty and to hire an audit team to assess the facility and its operations to determine the source of the low-pH discharges. The civil penalty of $949,000 consisted of cash payments totaled $500,000 and allowed Old Dutch to apply the balance toward a required audit and other corrective actions. (*Id.*)

- On February 18, 2019, Santich signed an EPA Expedited Settlement Agreement, where he agreed to pay a penalty of $4,766 to address discharges of acidic materials. (*Id.*)

Due to these enforcement actions, the Unnamed Stream was closely monitored. Monitoring Sondes in the Unnamed Stream took pH readings every 15 minutes and the company's environmental consultant checked them at least biweekly. If the pH dipped or spiked beyond certain thresholds, an alarm would sound so the company could take needed corrective actions and report to EPA. Despite these efforts, Santich did not make the necessary changes and, to this day, the defendants have continued to discharge highly acidic wastewater into New Hampshire's waterways and so remain subject to close scrutiny by regulators. (PSR ¶¶ 13-14, 33A-33C.)

[5] Santich opted not to invest in scalable and more sustainable (but more expensive) corrective actions, such as building a treatment plant to treat the water such that it could be safely discharged into the environment or used for on-site irrigation. (Santich PSR Add. at 2; 2010 Lagoon Decommissioning Feasibility Study, USAONH-3982–4036.)

2. Santich's Scheme to Illegally Discharge his Manufacturing Waste into the Souhegan River.

While subject to this scrutiny, in approximately 2016 and 2017, Santich devised and implemented a scheme to secretly pump wastewater into the Souhegan River. Santich buried a secret pipe and altered the plumbing of his facility to pump wastewater into the Souhegan River downstream of the monitoring in the Unnamed Stream. (*See* Ex. 1 (maps of facility and discharge path).) Santich benefited from this scheme in multiple ways. For example, Santich evaded EPA and NHDES monitoring of his environmental violations and avoided the associated costs needed to bring his facility into environmental compliance. Santich also reduced the amount of wastewater he had to store (particularly on weekends and holidays) and to pay to haul offsite. (PSR ⁋ 15, 22; Santich PSR Add. at 2-4.) Notably, Santich concocted and executed the scheme shortly after the 2016 New Hampshire Consent Decree. During this time, Old Dutch's environmental consultant was auditing the company's compliance with that Decree and Old Dutch was documenting and submitting compliance-related expenses to the State for approval to reduce its fine. (PSR ⁋ 15.)

*a. Building the Infrastructure to Illegally Discharge.*

In the spring of 2017, Santich hired an excavation company to extend an underground pipe several hundred feet to an old, abandoned railroad bed at the top of the hill about 30 feet above the facility.[6] Santich then used this pipe to discharge wastewater (both manufacturing waste and contaminated ground and stormwater) up the hill through the pipe. The pipe discharged just over the top of the hill to the abandoned railroad bed and into a ditch Santich had constructed and lined with riprap (a type of drainage stone used to prevent erosion). As pictured below, the ditch directed

---

[6] Before he extended it, Santich used the pipe to water Christmas trees that he planted on the property around the time NHDES decommissioned the wastewater lagoons. (*See* PSR ¶ 16; May 9 & 24, 2024 Employee Interviews, USAONH-4276, USAONH-4638.) By 2017, the trees were fully established and no longer needed to be watered. (PSR ¶ 16; Santich PSR Add. at 4.)

the wastewater downhill to a natural swale then to a channel into the Souhegan River. (*Id.* ¶¶ 17-18, 22; Santich PSR Add. at 5; Ex. 1.)

**Pipe Discharging**
**<u>(August 2, 2023)</u>**



**Drainage Ditch**
**<u>(May 23, 2023)</u>**






**Ditch/Swale**
**<u>(May 23, 2023)</u>**



**Channel from the ditch to River and discharge in the River**
**<u>(May 19, 2023)</u>**





Santich also modified the facility's plumbing to facilitate his illegal discharge operation.

Initially, Santich installed a three-way valve located in the RO (or reverse osmosis) room at the facility. This valve could be switched to direct wastewater either to the wastewater storage tanks or to the illegal discharge pipe. (PSR ⁋ 19.) Santich repeatedly directed one of his maintenance employees (who also handled the facility's wastewater) to use this valve to direct wastewater and contaminated ground and stormwater up the hill. (*Id.* ⁋ 19.) Santich often issued the order directly but sometimes did so through other employees. (*Id.* ⁋ 19, 21; Santich PSR Add. at 3-6, 20.)

To handle the volume of wastewater his company produced, Santich routinely made changes to more efficiently pump wastewater and contaminated ground and stormwater up the hill and into the Souhegan River. For example:

- In March 2021, Santich directed the excavation company to install an underground "sentinel sump" at the corner just outside of the tank farm to collect contaminated stormwater. Santich had this sump and another older sump inside the tank farm piped to pump up the hill through the buried pipe. The defendants credited the cost of the work installing the new sump against their fine under the 2016 Consent Decree. (PSR ⁋ 22)

- That same year, Santich replaced the three-way valve with a manifold system. Unlike the three-way valve, which could be turned to send contaminated ground water from the sumps in and near the tank farm to the wastewater storage tanks, the manifold system could not do that. Instead, it sent all contaminated waters from the sumps directly up the hill, and from there the wastewater flowed to the Souhegan River. (*Id.*)

- In 2022, Santich again hired the excavation company to improve the manmade ditch at the top of the hill and line it with riprap to better facilitate the flow of wastewater into the Souhegan River. (*Id.*)

- In the spring or summer of 2023, Santich directed a fourth line (or pipe) to be installed for his maintenance employee to use to move excess wastewater from the wastewater tanks and ultimately up the hill. Previously Santich's employees used a food processing line to pump wastewater to an outside storage tank (Tank 25), from which it was piped to the tank farm sump and pumped up the hill. This new "line four" allowed Santich to pump wastewater to Tank 25 and up the hill without using a food processing line. One employee reported that sometimes wastewater would flow through this fourth line all day. Another employee reported that Santich further modified Line Four to bypass the outside storage tank such that wastewater could also be pumped directly from the wastewater tanks and up the hill.[7] (PSR ⁋⁋ 21-22; Santich Add. at 5, 12.)

[7] May 7, 2024 Employee Interview, USAONH-4610-13.

The sumps Santich plumbed to pump wastewater up the hill are pictured below. On the day of the search warrant, EPA-CID saw a soft hose near Tank 25 to discharge waste into the tank farm sump.

**Sentinel Sump outside of Tank Farm**
**<u>(August 2, 2023)</u>**




**Tank Farm Sump with Pipe to Tank 25**
**<u>(August 2, 2023)</u>**



As pictured below, the manifold system Santich installed was connected to these sumps (the "A-7" line), the R.O. room sump (the "R.O. Sump" line), and Line Four (the "L4" line). Because of its design, all water that entered this manifold would be pumped up the hill through the illegal discharge pipe. (PSR ⁋ 22; Santich Add. at 12.)[8]




[8] The government understands that, after EPA-CID executed the search warrant in August 2023, the manifold was modified such that the contaminated sump water could be directed through the "RO Sump" line and, eventually, to the wastewater storage tanks.

While building the infrastructure for his illegal discharge scheme, Santich took steps to conceal his crime. First, he lied to his contractors. Santich told the excavation company the drainage ditch would manage the flow of natural spring water and told the plumbing company that the underground pipe was used to water Christmas trees. (PSR ⁋ 22; Santich PSR Add. at 4-5).

Knowing he was subject to scrutiny, Santich took steps to ensure there wouldn't be a paper trail. For example, around the time Santich settled certain acidic discharges with the EPA in February 2019, he hired the excavation company to construct the riprap-lined ditch in the old railroad bed to direct water from his illegal discharge pipe toward the Souhegan River. (PSR ⁋⁋ 13; Santich PSR Add. at 5). The company sent Santich a proposal on February 27, 2019, that included a "Rain Garden" in the "bed of the old R.R." for which the excavation company was to "[s]upply and install sand and rip-rap at outlet of drain line," "[c]reate sand berms and swales for discharge drain," and "create a rip-rap outlet swale." Thereafter, the proposal was altered to remove references to the illegal discharge drain and swale and sent to Santich on March 21, 2019.

**<u>Original February 27, 2019 Version</u>**

Proposal Date: 2/15/2019
Proposal #: 477
Project:

Bill To:
PILGRIM FOODS
GREENVILLE NH
03048

| Description | Est. Hours/Qty. | Rate | Total |
|---|---|---|---|
| PLANT PROJECTS 2019<br>GREENVILLE NH<br>WATERPROOF CONCRETE RETAINING WALL<br>Roll on type stucco membrane $3.80 sq. ft.<br>Approx 500 sq. ft. | | 3.50 | 3.50 |
| INSTALL A TANK/CONCRETE VAULT ABOVE CBY 17 IN PLACE OF EXISTING CATCH BASIN IN PARKING LOT AREA<br>Sawcut and remove asphalt<br>Custom core the inlet and outlet side of new vault to match existing pipe size<br>Establish elevation using existing drainage pipe<br>Install a separate vault for the automated valve apparatus<br><br>Automated valve to be supplied by Pilgrim | | 11,850.00 | 11,850.00 |
| RAIN GARDEN<br>Supply and install sand and rip-rap at outlet of drain line<br>Rain garden to be downstream of outlet pipe<br>Place sand in bed of old R.R.<br>Create sand berms and swales for discharge to drain through<br>Create a rip-rap outlet swale | | 4,700.00 | 4,700.00 |
| GRADE PARKING LOT<br>Supply and install gravel in existing parking lot | 144 | 28.00 | 4,032.00 |
| | | Total | $20,585.50 |

**<u>Altered March 21, 2019 Version</u>**

Proposal Date: 2/15/2019
Proposal #: 477
Project:

Bill To:
PILGRIM FOODS
GREENVILLE NH
03048

| Description | Est. Hours/Qty. | Rate | Total |
|---|---|---|---|
| PLANT PROJECTS 2019<br>GREENVILLE NH<br>WATERPROOF CONCRETE RETAINING WALL<br>Roll on type stucco membrane $3.80 sq. ft.<br>Approx 500 sq. ft. | | 3.50 | 3.50 |
| INSTALL A TANK/CONCRETE VAULT ABOVE CBY 17 IN PLACE OF EXISTING CATCH BASIN IN PARKING LOT AREA<br>Sawcut and remove asphalt<br>Custom core the inlet and outlet side of new vault to match existing pipe size<br>Establish elevation using existing drainage pipe<br>Install a separate vault for the automated valve apparatus<br><br>Automated valve to be supplied by Pilgrim | | 16,550.00 | 16,550.00 |
| GRADE PARKING LOT<br>Supply and install gravel in existing parking lot | 144 | 28.00 | 4,032.00 |
| | | Total | $20,585.50 |

(Exs. 2, 3.) When interviewed by investigators, the owner of the excavation company could not explain why he had two of the same identically priced proposals that list different work. He did explain that the term "rain garden" came from Santich and that, though he did not build a rain garden, he did install a riprap swale and berms in the old railroad bed. (Santich PSR Add. at 5.)

*b. Conscripting Employees to Commit and Conceal His Crime.*

Santich also conscripted his employees into his criminal conduct. As laid out in the PSRs and their Addenda, Santich involved at least five of his employees (including one of his plant managers) in his criminal conduct. (PSR ⁋⁋ 21, 42; Santich PSR Add. at 3-4, 20.) For example, Santich directed his maintenance employee to pump up the hill early in the morning or late at night and sometimes to pump up the hill all night. He also discharged up the hill on Fridays because the trucking company did not pick up wastewater on weekends or holidays. (Santich PSR Add. at 3.) When his maintenance employee was unavailable, Santich ordered a different employee to turn the valve. (*Id.* ⁋ 19, 21; Santich PSR Add. at 3-6, 20.) Multiple employees also reported hearing Santich order an employee to direct his maintenance employee to send water up the hill. For example, on one occasion an employee heard Santich say "We're fucked. We're fucked" "you need to get [the maintenance employee] to send it up the hill." On another occasion, one of Santich's plant managers told a different employee that one of Santich's secrets was the three-way valve and that "when wastewater got too full or if they had a big spill . . . they could pump it up the hill if they wanted to." (Santich PSR Add. at 4.)

Santich also involved his employees in hiding and covering up his crime. For example, Santich told at least two employees that if he were caught, he would say he was using the illegal discharge pipe to water the Christmas trees on the property (in reality, after Santich extended the pipe to the top of the hill, he only used it to discharge wastewater and never to water Christmas

trees). One employee reported that on the day of the EPA-CID search warrant, Santich told some of his employees that "I'll tell them [federal investigators] that I had just planted mustard seed up at the top of the hill." (Santich PSR Add. at 4.) This is the same lie Santich told state inspectors three months prior when they inspected the facility and discovered the mustard manufacturing waste in the abandoned railroad bed. (PSR ⁋ 24, 26; ECF No. 2 at 7.) Santich later instructed at least one of his employees to repeat this lie to federal investigators and, ultimately, two of Santich's employees repeated this falsehood in interviews or to the Grand Jury. (Santich PSR Add. at 4.)

Several employees reported that if they did not follow orders and discharge the wastewater or conceal the crime, Santich would have fired them. For example, the maintenance employee Santich most often ordered to commit the crime said he knew Santich would fire him if he didn't follow orders and that Santich always said that in New Hampshire he didn't need a reason to fire somebody, he could just fire them. (Santich PSR Add. at 1-6, 20.) Another employee testified that he did not report the illegal discharges to the company's environmental consultant because: "I didn't want, you know, to get in trouble with the boss I guess, you know. Don't cross your boss is what, you know, my grandfather always kind of told me. So, I didn't know what would happen. Would he fire me, would he threaten me, I don't know. I don't know what he would do." (*Id.*)

3. Santich's Efforts to Conceal his Crime from EPA.

Santich's efforts to conceal his crime were not limited to his making his employees lie and they did not begin when he was caught. From the beginning of his scheme in 2017 until he was caught in August 2023, Santich repeatedly submitted false information to the EPA and other regulators to conceal his illegal discharge operation. (PSR ⁋⁋12A, 29; Santich PSR Add. at 2-3.) Notably, during this time, Santich was in charge of environmental compliance, ensuring compliance with Old Dutch's stormwater permit and administering the SWPPP at Old Dutch. (PSR ⁋12A.) Regulators relied on Santich to provide them complete and accurate information to ensure

environmental compliance at the facility. (*Id.*; Santich PSR Add. at 6-7.)

Yet Santich routinely submitted false site plans and maps, required by his stormwater permit, that purported to show all stormwater conveyances, including "ditches, pipes, and swales." (PSR ⁋⁋ 12A, 29; Santich PSR Add. at 6-7.) Each time, Santich concealed the underground wastewater pipe and the drainage ditch he used to discharge contaminated stormwater into the river. Santich also submitted false responses to EPA information requests for information about wastewater pipes and the use of sumps near the tank farm area at the facility. Under penalties of perjury, Santich omitted his underground wastewater pipe in his responses to those requests, and did not disclose that he was using those sumps to pump contaminated stormwater and wastewater into the Souhegan River. (*Id.)*

Santich did not limit his efforts to hide his crime to these false certifications. He also frustrated EPA's efforts to monitor the volume of wastewater and contaminated ground and stormwater he pumped (unbeknownst to EPA) into the Souhegan River. For example, as discussed already, in 2021, Santich secretly modified the plumbing at the facility so that the tank farm sump could automatically pump wastewater up the hill when the float valve was activated. (PSR ⁋ 22; PSR Add. at 5, 12.) In October of that year, EPA asked the defendants to meter the volume of water pumped through that sump. In his reply, Santich falsely claimed that it would be impractical and that the system was "directly connected to Pilgrim's wastewater system and not connected to the stormwater system." (Santich PSR Add. at 2.) Santich did not state that the sump was piped to discharge into the Souhegan River. Santich promised to manually monitor the volume of water pumped through the sump and measure the pH levels. (*Id.*)

When EPA later asked for the promised manual monitoring results, Santich responded that they did not do any manual monitoring because they decided to let the sump operate automatically.

Santich claimed that this was because they were "concerned about the environmental risk associated with significant precipitation events that could potentially occur during hours when the facility was unmanned." (*Id.*) But, again, Santich did not disclose that he was using this unmetered and unmonitored sump to pump acidic wastewater through the underground pipe and into New Hampshire's waterways.

Santich further concealed his crime from the EPA by deceiving his environmental consultant, who monitored the Sonde data and assisted in communicating with EPA. For example:

- Santich directed an employee to scrub algae (later identified as sewage fungus caused by acidic discharges) off the rocks in the Unnamed Stream before the consultant came to the facility
- After an employee told the consultant that the monitoring Sondes had been out of the water, Santich and the company HR Manager told the employee not to volunteer information to their environmental consultant.
- Santich told a maintenance employee that a switch the employee was repairing was used to discharge vinegar waste but that he was not to mention it to anyone, especially "the woman who was responsible for coming in and taking samples"—that is, his environmental consultant.
- May 23, 2023, Santich lied to both his environmental consultant and NHDES inspectors, claiming that the vinegar and mustard waste were in the old railroad bed because he was trying to plant mustard plants.

(PSR ¶¶ 14, 24; Santich PSR Add. at 3.)

4. The Defendants' Post-Plea Conduct.

Since signing their plea agreements, Santich has continued to discharge pollutants in violation of the Clean Water Act. (PSR ¶¶ 33A-33C.) Sonde data provided by the company as required by prior enforcement actions shows evidence of post-plea discharges into the Unnamed Stream. These discharges sometimes lasted for hours at a time, despite the alarm system that notifies the defendants of low pH readings. (*Id.* ¶ 33A.) For instance, days after signing their plea agreements, on January 20-22 and 27, 2025, the defendants made at least four acidic discharges,

each lasting between two and twelve hours. The defendants later provided the EPA with incomplete and contradictory explanations of these discharges. In February 2025, the defendants initially told EPA that "[s]onde panel alarms were received and Pilgrim personnel responded" and that the acidic discharges were due to lack of wastewater storage capacity. (*Id.* ⁋ 33B.) Months later, in response to an EPA information request and in tension with their prior response, the defendants claimed that company personnel did not, in fact, observe the cause of the alarm and that the discharges were not due to lack of storage capacity but rather a pump capacity issue. (*Id.* ⁋ 33B.) The defendants have not yet explained why production continued despite days of hours-long acidic discharges into the Unnamed Stream.

On November 6, 2025, EPA issued a Notice of Violation, informing the defendants of another of their post-plea Clean Water Act violations in September and October 2025. In sum, the defendants discharged Quikrete Hydraulic Cement into the Unnamed Stream while attempting to repair a culvert. Quikrete is a hazardous material with a pH of 13. The defendants initially stopped work after the Sondes alarmed due to high pH in September and on October 1. The next day, on October 2, they reported to the State of New Hampshire's hazardous materials spill response unit (but not to EPA) that the high-pH readings were due to culvert repair work at the facility. Yet, they continued the repair work, resulting in additional discharges on October 6 and 7, 2025.

On October 8, 2025, they explained some of the discharges to EPA (they did not report or explain the October 6 and 7 discharges). Of concern is that, while the defendants had previously informed EPA that they intended to do this repair work, they did not obtain the required State permits or take necessary steps to do the repairs without discharging hazardous materials into New Hampshire's waterways. For example, the defendants told EPA that "personnel were performing spot repairs in the upper half of the culvert . . . . No work has been done below the waterline, nor

will it be without approval from NHDES and/or EPA to establish appropriate bypass." But the defendants did not "establish an appropriate bypass" (with or without approval), and video recorded before and after the repair appears to show work done in the lower half of the culvert and/or below the waterline. (PSR ⁋ 33C.) As a result, after pleading guilty to criminal Clean Water Act violations and while awaiting sentencing, on at least five separate days the defendants discharged hazardous material into the waters of the United States.

### B. <u>The PSRs Correctly Calculate the Defendants' Guideline Range.</u>

The PSR for Old Dutch correctly determined that, under the Sentencing Guidelines, the Court shall impose a term of probation of at least one year and not more than five years and that the company is subject to a maximum fine of $1.5 million and a $1,200 special assessment. (ODM PSR ⁋⁋ 51-55.)

As for Santich, the PSR correctly determined that Santich's' Total Offense level is 19. (Santich PSR ⁋ 48.) This consists of a base offense level of 6 under section 2Q1.3, a 4-point enhancement because Santich discharged without a permit, and a 6-point enhancement because "the defendant implemented a scheme to unlawfully discharge acidic wastewater and stormwater into the Souhegan River from a covert pipe he had built and used from at least May 2017 until the execution of the federal search warrant on August 2, 2023" which resulted in "an ongoing, continuous, or repetitive discharge of a pollutant into the environment." (*Id.* ⁋⁋ 38-40.) The PSR also properly applied (i) a 4-point enhancement because Santich was the organizer and leader of criminal activity that, as laid out above, involved five or more participants and was otherwise extensive; and (ii) a 2-point enhancement because the defendant abused his position of trust with the EPA by "frustrat[ing] EPA's ability to adequately monitor the facility's wastewater discharge by falsely certifying SWPPP-related forms that omitted the existence or identification of the riprap

ditch/swale, illicit pipe, and discharge to the Souhegan River." (*Id.* ¶¶ 42-42A.) After applying a 3-point reduction for acceptance of responsibility, the defendant's Total Offense Level is 19, resulting in a sentencing guideline range of 30 to 37 months imprisonment. (*Id.* ¶ 75.) Because the defendant pleaded guilty to a one-count information, the statutory maximum for the offense is 3 years, or 36 months. (*Id.* ¶ 74.)

## II. ARGUMENT

### A. A Downward Variance is not Appropriate and the Court Should Impose a Sentence at the Top of the Guidelines Range.

Santich inherited a company with a history Clean Water Act violations. By 2009, he took charge of environmental compliance at the facility and knew he had to work with state and federal regulators to get it into compliance. Instead, at every step, Santich frustrated and evaded those efforts. Instead of spending the money needed to fix his facility, Santich executed a scheme to pump his excess wastewater into the Souhegan River. Along the way, he conscripted his employees and contractors to assist in his crime, all while lying to regulators. This is not a "garden variety" Clean Water Act case. A sentence at the high-end of the guidelines is necessary to achieve the purposes of sentencing

#### 1. The Nature and Circumstances of the Offense

As laid out above and in greater detail in the PSR, the nature and circumstances of Santich's crime are much more serious than a typical Clean Water Act case. State and Federal environmental agencies have worked with Santich for years to try to get Old Dutch to stop discharging acidic water into New Hampshire's waterways. In the face of these efforts, Santich built the infrastructure needed to secretly pump and dump his manufacturing waste directly into the Souhegan River. He not only buried the pipe but also had drainage ditches built to facilitate the flow of the waste into the river. Santich altered the pluming of the facility so that the sumps automatically pumped

contaminated stormwater up the hill and so that he could more easily direct wastewater from the wastewater storage tanks and up the hill.

When building his illegal discharge infrastructure, Santich lied to his contractors and altered documents to obscure the work they were doing. Santich had one contractor install a sump to be used to pump wastewater into the Souhegan then brazenly had the cost of that installation credited against the fine imposed in a prior civil environmental enforcement action. Once the infrastructure was in place Santich needed people to operate it, so he conscripted his employees to pump wastewater up the hill and into the river. His employees knew it was wrong, but as one testified, if they refused to pump wastewater up the hill Santich "would have said hit the road" and that "there's no doubt in my mind he would have fired me. . . . It's either Charlie's way or the highway." (Santich PSR Add. at 6.)

Santich ensured that EPA could not determine how much wastewater he generated by routinely and repetitively lying in his required submissions to EPA and by making sure that EPA would not meter or monitor the volume of water pumped through a sump he used to pump both wastewater and contaminated storm and groundwater up the hill. Finally, when caught, Santich didn't come clean. He tried to cover it up. In May 2023, he lied and told NHDES inspectors that the mustard waste at the top of the hill was a failed attempt at planting mustard seed. Santich directly instructed at least one of his employees to repeat this lie to criminal investigators and two of them did so.

In short, the nature and circumstances of Santich's crimes require a significant sentence of incarceration at the high-end of the guidelines.

### 2. The History and Characteristics of the Defendant

Though this is his first criminal conviction, Santich's actions in committing and concealing his crime and during the government's investigation demonstrate a long pattern of criminal thinking and lack of remorse. Santich committed this crime with callous disregard to its environmental impact while casually lying to government agencies. He conscripted others into aiding his crime through threats and deceit.

Defendants in white collar criminal cases frequently rely on numerous letters of support from family and friends, and Santich is unlikely to differ in this regard. The Court should consider these letters in evaluating Santich's history and characteristics. But the Court should also consider what Santich did when his family and friends were not looking. Investigators interviewed well over a dozen witnesses, including many of Santich's current and former employees. They consistently described Santich as treating his employees poorly (some said he referred to them as "peasants") and creating an atmosphere where people feared getting fired if they did not do what Santich told them to do. Multiple employees described how Santich defaulted to dishonesty and criminal thinking in his business dealings and environmental compliance efforts. For example, one employee described the rumored illegal discharge pipe as "a very Charlie Santich idea." Another stated that Santich "time and time again fully and unequivocally aims and attempts to circumnavigate laws of all kinds to run his business." (Santich PSR Add. at 2, 4.)

These characteristics are not only reflected in the way Santich committed the instant offense, but also in how he instinctively turned to dishonesty when caught. Santich's ongoing post-plea Clean Water Act violations are more of the same and demonstrate a continued disregard for the law and lack of remorse. They also raise a serious concern that he is not serious about changing this pattern of conduct. A below-guideline sentence is not warranted.

### 3. Need for Sentence to Reflect Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense

A sentence at the top of the Guidelines range is necessary to reflect the seriousness of Santich's years-long scheme to enrich himself and evade environmental regulators by pumping wastewater into New Hampshire's waterways. The Souhegan River is a tributary to the Merrimack River in southern New Hampshire. Environmental crimes such as this harm every New Hampshire resident who depends on clean water and frustrate efforts to restore these waterways.

Santich's crime caused harm. Acidic water is harmful to aquatic life and directly impacts fish. (PSR ¶¶ 30-32.) Periodic spikes of acidic wastewater pumped directly into the Souhegan River not only harms fish and other aquatic life but prevents the river from recovering from the past harm—including fish kills—caused by Old Duch's decades of discharging acidic water into the river. (*Id.* ¶¶ 13, 30-32.) Santich was aware of this impact due to his experience with the Unnamed Stream and not only acted with utter disregard to this harm but hid his crime, hindering authorities from quantifying how much waste he pumped and the full extent of the harm.

It is not government's role to micromanage industry, and the EPA and other regulators have limited resources to monitor compliance with their permits and other environmental laws. The entire permitting system depends on the good faith efforts of businesses and their owners to seek and abide by the appropriate permits and provide truthful information to EPA when issues inevitably arise. Not only does Santich's persistent dishonesty and criminal conduct undermine this system, but it also gave him a competitive advantage over those around the country who spend the resources needed to properly dispose of their manufacturing waste.

Through his conduct, Santich demonstrated his belief that certain laws do not apply to him. A sentence at the top of the guidelines is needed to reflect the seriousness of Santich's crimes, promote respect for law, and provide for just punishment in this case.

4. Sentencing Ranges Established by Guidelines

As the Court is aware, the Sentencing Guidelines reflect the consensus that individuals convicted of white-collar crimes should not be able to avoid incarceration, even where such crimes constitute a defendant's first offense. Indeed, the Sentencing Guidelines *already* take into consideration Santich's criminal history and that, due to his leadership role in the scheme, he is not eligible for a further reduction as a "zero-point offender." *See* USSG §§4C1.1(a)(10). Indeed, one of the goals of the Sentencing Reform Act of 1984 was to rectify a serious problem in the criminal justice system: "some major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses." *See* U.S.C.C.A.N., 98th Cong., 2nd Sess. (1984) at 3260; *accord United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting importance of "deterrence of white-collar crime (of central concern to Congress)" and "the minimization of discrepancies between white-and blue-collar offenses"). Imposing prison sentences for serious white-collar crimes such as this addresses the considerable, but difficult to quantify, harm these crimes cause society.

A guideline sentence is particularly appropriate here as it accounts for, among other things, Santich's repetitive discharges without a permit, Santich's leadership role and abuse of trust. Santich led an extensive and brazen environmental crime, riddled with deceit and efforts to obstruct the government's effort to enforce its laws, to repeatedly discharge pollutants into the waters of the United States. The guideline range here accounts for Santich's criminal conduct and a sentence at the high end is appropriate.

5. Deterrence

The Court must also consider the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). As laid out above, Santich has proved undeterrable through administrative and civil enforcement. His response to those efforts was to commit this

criminal offense to evade those civil and administrative enforcement mechanisms. A high-end sentence is necessary to get through to the defendant that his criminal conduct is serious and he should have stopped, even if only to avoid time in prison.

More broadly, deterrence is particularly important because would-be criminal polluters have a tremendous economic incentive to commit these crimes, which they can easily rationalize as victimless as the harm is shared by all who use our natural resources. This is especially so in cases such as this where the pollutant is secretly pumped into a large common waterway and the harm is diffused across aquatic life and the people who rely on those water sources in numerous ways. This is a crime done in secret and is difficult to detect. Absent a substantial prison sentence, others, like Santich, may weigh the costs of complying with the law against potential fines and other monetary penalties and decide breaking the law is the better economic choice. A substantial prison sentence is especially necessary to deter would-be criminals, like Santich, who have the means to cut a check if and when they are caught and to "limit[] . . . the ability of those with money or earning potential to buy their way out of jail." *Mueffelman*, 470 F.3d at 40.

Put simply, knowing that this serious criminal conduct will result in a substantial prison sentence, and not merely a fine and probation, is necessary to deter Santich and others who are inclined to take shortcuts and illegally discharge their manufacturing waste to save money at the expense of our shared natural resources and their fellow citizens.

### B. <u>**The Court Should Impose a $1.5 Million Fine for the Company and at least a $500,000 Fine for Santich.**</u>

As part of its plea, Old Dutch agreed to pay a $1.5 million fine, the statutory maximum. (ODM PSR ¶¶ 4, 53, 58.) Both Santich and Old Dutch also agreed to pay joint and several forfeiture money judgments consisting of "the gross proceeds" they "obtained, directly or indirectly" from their offenses (ECF No. 2 § 12; ECF No. 3 §11.) For the reasons below, the

government asks that the Court impose at least $2 million in criminal financial penalties consisting of a $1.5 million fine for Old Dutch and fine of at least $500,000 for Santich.

The defendants committed a "a felony violation of the Federal Water Pollution Control Act," 18 U.S.C. § 1956(c)(7)(E), so "[t]he scope of forfeitable property is delineated in section 981(a)(1)(C)." *United States v. George*, 886 F.3d 31, 39 (1st Cir. 2018). Here, property is forfeitable to the United States if it "constitutes or is derived from proceeds traceable to" the defendants' Clean Water Act offenses. *Id.* (quoting 18 U.S.C. § 981(a)(1)(C)). For cases like this that "involve[e] . . . unlawful activities," proceeds consist of "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to the forfeiture, and any property traceable thereto." *Id.* at 39-40 (quoting 18 U.S.C. § 981(a)(2)(A)). In this case, the defendants' criminal proceeds consist of *at least* the costs avoided (i) to ship the pumped wastewater and ground and stormwater offsite; and (ii) to bring the facility into compliance.

As discussed already, multiple witnesses indicated that the defendants routinely discharged on nights, weekends, and holidays and during heavy storm events. But, due to the nature of the defendant's crime and his extensive efforts to conceal it—including their preventing EPA from metering the very pump he used to illegally discharge his wastewater—it is difficult to determine with certainty the volume of wastewater discharged and thus not shipped off site. However, even considering the defendants' conservative estimate, (*see* Santich PSR Add. at 12; PSR ¶10), the defendants saved, at a minimum, hundreds of thousands of dollars in shipping costs.

As for the costs of compliance, the proceeds are likewise minimally in the hundreds of thousands of dollars. For example, a 2010 feasibility study proposed the below options to manage wastewater generated by Old Dutch:[9]

[9] Lagoon Decommissioning Feasibility Study, USAONH-3982–4036.

| **Wastewater Management Options** | **Initial Capital Cost Estimate** | **30-Year Net Present Worth Cost Estimate** |
|---|---|---|
| Transport/discharge wastewater to alternate treatment/disposal facility | $100,000 | $2,800,000 |
| On-Site Treatment for Reuse and/or Direct Discharge to POTW | $1,500,000 | $3,100,000 |
| Wastewater reuse for on-site irrigation | $2,500,000 | $3,600,000 |

Santich chose the least expensive, but also the least sustainable, option: transporting wastewater off site. (PSR ¶ 13.) The delta between the upfront capital costs of that option and other options that would have better managed wastewater over time is more than a million dollars, and the delta in the estimated cost over time is between $300- to $800,000.

Nevertheless, the government acknowledges the difficulty determining the extent defendants' crime proceeds and that there are other financial penalties that the Court can impose to account for the defendants' ill-gotten gains. The Company has agreed to pay a $1.5 million fine, is currently paying a substantial (if belated) amount to a consultant with the goal of bringing the company into environmental compliance, and, according to the PSR, is in a difficult financial position. (ODM PSR ¶ 48.) The goal of criminal financial penalties is not to shut down the business, but to divest it from its ill-gotten gains, provide appropriate punishment, and incentive Old Dutch to finally comply with the law. *Cf.* USSG § 8C2.4 (base fine is at least "the pecuniary gain to the organization from the offense"). Seeking additional criminal financial penalties against the Company at this time could frustrate these efforts.

Santich, on the other hand, has a net worth of "over $4.7 million, prior to consideration of his business interests." (Santich PSR ¶ 70-73, 81-84.) As with forfeiture, in determining an appropriate fine, the Court should consider "the gain to the defendant . . . [and] any other pertinent equitable considerations." USSG § 5E1.2(d)(1), (8). "The amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." *Id.*

In light of all of this, the government requests that, in lieu of ordering a forfeiture money judgment, the Court impose a $1.5 million fine for Old Dutch and a fine of at least $500,000 for Santich. Though imperfect, together with a 36-month term of imprisonment for Santich and a robust Environmental Compliance Program, a total of at least $2 million in criminal financial penalties is appropriately punitive while at least partially accounting for the defendants' gain.

## III. CONCLUSION

For these reasons, the United States respectfully requests that the Court sentence Old Dutch Mustard to five years' probation, order Old Dutch to establish an effective environmental compliance program and environmental ethics program as a condition of probation, and impose a $1.5 million fine. The government also requests that the Court sentence Charles Santich to 36 months' imprisonment and impose a fine of at least $500,000. Such a sentence is sufficient but not greater than necessary to achieve the purposes of sentencing and is appropriate here.

Dated: March 30, 2026

Respectfully submitted,
ERIN CREEGAN
United States Attorney

By:/s/ Matthew T. Hunter
Matthew T. Hunter
Assistant United States Attorney
53 Pleasant St., 4th Floor
Concord, NH 03301
Matthew.Hunter@usdoj.gov

/s/ Richard J. Powers
Richard J. Powers
Trial Attorney
Environmental Crimes Section
150 M Street N.E., Suite 4.108
Washington, D.C. 20002
richard.j.powers@usdoj.gov