**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

UNITED STATES OF AMERICA

v.

CHARLES SANTICH and

OLD DUTCH MUSTARD CO., INC., d/b/a PILGRIM FOODS, INC.

Defendants.

No. 1:25-cr-00002-LM-TSM-01/02

# DEFENDANTS' MEMORANDUM IN AID OF SENTENCING AND MOTION FOR *BOOKER* VARIANCE

Nathan P. Warecki (NH Bar No. 20503)
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101
Tel: (603) 628-4000
nwarecki@nixonpeabody.com

Mark D. Lytle (admitted pro hac vice)
799 9th Street NW, Suite 500
Washington, DC 20001
Tel: 202.585.8435
mlytle@nixonpeabody.com

Mathew Todaro
VERRILL DANA, LLP
1 Portland Square, Floor 10
Portland, Maine 04101
mtodaro@verrill-law.com

Attorneys for Charles Santich and Old Dutch Mustard Co., Inc. d/b/a Pilgrim Foods, Inc.

NOW COMES the Defendants, Charles Santich ("Defendant" and "Mr. Santich") and Old Dutch Mustard Co., Inc. d/b/a Pilgrim Foods (the "Company" and/or "Old Dutch"), by and through undersigned counsel, and hereby file the present Memorandum in Aid of Sentencing and Motion for *Booker*[1] variance respectfully requesting that the Court impose the following sentences:

(1) for Charles Santich, a sentence of five years of probation with special conditions that require Mr. Santich to take all steps necessary to operate and direct the Company to implement an: (A) effective Environmental Compliance Program ("ECP"); (B) Environmental Ethics Program ("EEP"); and (C) to comply with the requirements contained in the Administrative Order for Compliance on Consent ("AOC"); (D) pay a minimum fine of $5,000; and (E) the payment of joint and several criminal forfeiture in the amount of $194,536.34 for the Company and Mr. Santich pursuant to Fed. R. Crim. P. 32.2(b)(1).

(2) for the Company, a sentence of five years of probation with the same special conditions listed above as proposed for Mr. Santich; (A) pay a fine of $1.5 million, which can be paid in equal installments over five years pursuant to Title 18, United States Code, § 3572(d)(1), and applied to the implementation of the compliance programs listed above; and (B) payment of joint and several criminal forfeiture in the amount of $194,536.34 for the Company and Mr. Santich pursuant to Fed. R. Crim. P. 32.2(b)(1).

[1] This motion is predicated upon the Court's *Standing Order on Procedure for Requesting Deviation from Sentencing Guidelines*; 18 U.S.C. § 3553(a); *United States v. Booker,* 543 U.S. 220 (2005); *Rita v. United States,* 551 U.S. 338 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States,* 552 U.S. 38 (2007); *United States v. Jimenez-Beltre*, 440 F.3d 514 (1st Cir. 2006), *cert. denied*, 127 S. Ct. 928 (2007); and their progeny.

## I. Introduction

Pursuant to 18 U.S.C. § 3553(a)(2), the court "shall impose a sentence sufficient, but not greater than necessary," to accomplish the purposes set forth in the statute, including: to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence. Counsel submits that in this case, in which Mr. Santich (and the Company) pleaded guilty to and accepted full responsibility for his actions, a non-custodial sentence would more than fulfill the statutory goals of avoiding unwanted sentence disparities as well as the need for environmental compliance and improvements, the greater needs of the community, the town of Greenville, and the employees of Old Dutch. In determining what sentence to impose, the statute directs the court to consider the history and characteristics of the defendant as well as the nature of the offense. 18 U.S.C. § 3553(a)(1). While the statute instructs the court to consider the advisory Sentencing Guidelines in addition to other factors, the Guidelines "guide district courts in exercising their discretion, but do not constrain that discretion." *Beckles v. United States*, 580 U.S. 256, 257, 137 S. Ct. 886, 889, 197 L. Ed. 2d 145 (2017). Instead, the Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007).

The Supreme Court has explained that 18 U.S.C. § 3553(a) "tells the sentencing judge to consider (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) 'just punishment' (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution." *Id.* at 347-48. Mr. Santich and the Company present the following information to aid the Court in applying these factors to this case.

## II. Background

Mr. Santich is a 60-year-old husband, father, and small business owner with no prior criminal history, who stands before a sentencing court for the first time in his life. Upon the death of his father in 2014, Mr. Santich took over the leadership role at Old Dutch Mustard Co., Inc., a business that specializes in the manufacturing and sale of various private label brands of mustard and vinegar. The Company has been owned and operated by the Santich family since Mr. Santich's grandfather purchased it in 1942. Since 1972, the Company's main facility has been located in the town of Greenville, a rural and economically depressed region of southwest New Hampshire. The Company provides wages, benefits, and opportunities for over 60 full-time employees.

Mr. Santich began working for his father during college summer breaks, serving as the Company's "gofer" and doing whatever work was necessary. After starting his career working for other companies, Mr. Santich joined the Company full-time in 1991, when he was 26 years old. Despite his father's ownership, Mr. Santich experienced firsthand the manual labor necessary to produce the Company's vinegar and mustard. His first role was not behind a desk, but rather in the vinegar plant itself, learning the hands-on, painstaking nature of the business the hard way by aiding in the manufacturing process all aspects of the Company's products alongside the plant employees. After his father's death in 2014, Mr. Santich became President of the Company and took on responsibility for modernizing the nearly 100-year-old facility.

As head of the Company, Mr. Santich has worked hard to sustain his family's business while providing opportunities for local employees to grow and prosper in their roles. Employees with decades of experience such as Tammy Mailloux (37 years), Jean Ducharme (25 years), Denice Blanchard (20 years), and Stephen Moynihan (17 years) can attest to the investment that

Mr. Santich makes in his employees and the greater Greenville community. To both employees and contractors, Mr. Santich is far more than just a business owner: among his many hats, Mr. Santich is the Company's sales director, production expert, benefits coordinator, maintenance worker, and day-to-day operator.[2]

According to Mr. Jean Ducharme, a former Production Manager and employee of the Company for almost 40 years, "my tenure with [Mr. Santich] over the years has been extensive, we have had a long and very good relationship in and out of work he has always been very good to me and my family. Over the years Charles has also been very understanding to his staff and employees, if you were a good employee and followed the company rules you would be treated with the same respect from Charles."[3] Further, Mr. Ducharme noted that Mr. Santich "has always been conscious of what we need to do to make Old Dutch a top notch company that everyone can respect and be very happy to work for I know that I am proud that I've been part of what we are trying to achieve as a team."[4]

Tim Thode, current Production Manager, recounted Mr. Santich's kindness when helping employees in trouble. He wrote about the compassion Mr. Santich had for him when his wife had surgery and needed Mr. Thode's help, Mr. Santich did not hesitate to allow Mr. Thode all the time he needed to be there for his wife "without fear of losing my job. That meant a lot to me . . . He did not have to do that nor was it expected from him. He doesn't mention this. He doesn't remind me that he did this for me."[5]

---

[2] *See* Exhibit M, Character Reference Letter, Todd Sigmund (Mar. 23, 2026).
[3] *See* Exhibit C, Character Reference Letter, Jean Ducharme (Mar. 7, 2026).
[4] *Id.*
[5] *See* Exhibit N. Character Reference Letter, Tim Thode (Mar. 9, 2026).

Denice Blanchard has worked for the Company for more than 20 years in various capacities: HR Manager, Environmental, Food and Safety Coordinator, and as an Executive Assistant. "I believe Charlie to have a big heart. I have seen first-hand that he truly is a good person. He has paid employee spouses funeral expenses, given extra time off to those who have lost loved ones, always holding positions for those who experience some sort of health or home issue. He makes contributions to the Food Pantry in town and other local entities. He does care."[6]

Tammy Mailloux was incredibly grateful for her experience working for Mr. Santich. An employee for more than 37 years at the Company, she recounted how her husband had passed away a few years ago unexpectedly. "I was stunned when Charlie offered to pay for the funeral. To say the least, it was a huge weight lifted off my shoulders. I was also able to take all the time I needed to grieve. That meant very much to me and my family. It was not just about the money. It was knowing that Charlie was aware that it was a very hard time for me and he was willing to give me the time and support I needed to get through it. I was and continue to be grateful."[7]

In addition to his employees, Mr. Santich's friends and colleagues can attest to his dedication to the business, his generosity, and his love for his family. As Lon Seidman states, "[h]e is intensely committed to that responsibility [overseeing the Company's operations] because the business is not simply a business to him – it is deeply personal. [Mr. Santich] talks a lot about how he grew up watching his parents dedicate themselves to the operations of the New Hampshire plant. I know that since his father passed away a few years ago, Charlie views his

---

[6] *See* Exhibit A, Character Reference Letter, Denice Blanchard (Mar. 12, 2026).
[7] *See* Exhibit H, Character Reference Letter, Tammy Mailloux (Mar. 10, 2026).

role as continuing a family legacy that for decades has supported many employees. I know he takes that role very seriously."[8] Andrea Grossman echoed this sentiment: "[t]he facility in [New Hampshire] and all employees are treated like family by [Mr. Santich]. He shows them as much dedication as he does to his wife and daughter. [Mr. Santich] talks about the plant and his employees with pride. When he speaks of the growth of the business, and his ability to hire more people, he knows that he is helping his employees as well as the broader [Greenville, New Hampshire] community."[9]

With respect to the challenges of operating the Company, Gabrielle Redfern noted that Mr. Santich's "dual respect for family and commerce extends to the triple burden he carries to perpetuate the business, innovate and automate while protecting the livelihood of the workers he employes on the production line and in the various supporting roles."[10] Other friends have noticed Mr. Santich's prioritization of his employees and the balance necessitated by the needs of a growing business. "What has always stood out to me is how deeply he cares about the people who work for him. Even when discussing ways to improve efficiency in his business, his primary concern was always whether any change might negatively impact his employees and their livelihoods."[11]

William McKeon of Abbott Industries, Inc., a vendor to the Company for over 20 years, noted Mr. Santich's dedication to the Company's success, and shared that he "has worked extremely hard in upgrading systems, production platforms and efficiencies to try and improve the company performance. In conjunction with those efforts he has been laser focused on

[8] *See* Exhibit L, Character Reference Letter, Lon Seidman (Mar. 23, 2026).
[9] *See* Exhibit E, Character Reference Letter, Andrea Grossman (Mar. 23, 2026).
[10] *See* Exhibit K, Character Reference Letter, Gabrielle Redfern (Mar. 24, 2026).
[11] *See* Exhibit O, Character Reference Letter, Jeff Weiss (Mar. 26, 2026).

developing new opportunities and customers to grow his business and to establish a sound foundation for the future for his family, employees and customers. Today, I believe Old Dutch is one of the largest employers in the area."[12] Mr. McKeon also noted Mr. Santich's "personal approach to operations" and that he "is available to employees for guidance, support, problem solving and decision making. This also illustrates his attentiveness to duty, sense of responsibility, and his leadership qualities."

The attached letters demonstrate that Mr. Santich's life is motivated first and foremost by his love for his family, and his particular pride in his daughter, currently in college. This pride in his family is what motivates Mr. Santich in his leadership of the Company, and what inspires him to continue working and improving upon the legacy left to him by his grandfather and father, which he aspires to pass along to his daughter.

## III. Nature and Circumstances of the Offense

The Company has existed in one form or another since the early 1920s. When, in approximately 1942, the Company was purchased by Mr. Santich's grandfather, there would still be another 30 years to pass before Congress implemented the first version of the Clean Water Act ("CWA").[13] In those early days, manufacturers thought differently about the environment and certain CWA compliance challenges the facility experiences are in part attributable to its historic status. Over the decades, the Company has worked to adhere to new federal and state environmental requirements, but it has faced challenges in maintaining strict compliance.

As part of its vinegar and mustard production processing, the Company produces low pH wastewater. In 1972, Mr. Santich's father purchased the site located in Greenville, NH. The

[12] *See* Exhibit I, Character Reference Letter, William McKeon (Mar. 24, 2026).
[13] Federal Water Pollution Control Act Amendments of 1972, § 101 et seq., as amended, 33 U.S.C.A. § 1251 et seq.

Company has employed different processes for disposal of its wastewater over its long history at the New Hampshire facility. In early years, prior to enactment of the CWA, before such activities were unlawful, wastewater was discharged into an un-named brook that flows under the facility. More recently, the Company stored wastewater in two lagoons, permitted by the New Hampshire Department of Environmental Services ("NHDES"), for pre-treatment prior to discharge to Greenville, New Hampshire's publicly owned treatment works ("POTW"). In 2014, these lagoons were filled in and decommissioned with approval of NHDES. The Company enlisted the engineering firm Sanborn, Head & Associates, Inc. ("Sanborn") to conduct an alternatives analysis for wastewater processing. Sanborn provided several options and methods for treating/processing the wastewater. Ultimately, the Company learned of an opportunity to provide its wastewater via trucking offsite to Rochester, New Hampshire's POTW. A process, at the time, which was determined to be the most efficient and cost-effective means of wastewater disposal available. Further, Rochester's POTW benefited from the Company's low pH wastewater as it aided the overall treatment process and saved the city of Rochester in significant outlays for upgrades to its system and costs for chemicals on a yearly basis. The Company hired J.P. Noonan to truck its wastewater to Rochester on nearly a daily basis, paying an average amount per truckload of $577.80 in 2020, $601.90 in 2021, $738.87 in 2022, and $790.29 in 2023, sometimes twice a day.[14] The Company's relationship with J.P. Noonan continues to this day. And the Company continued shipping wastewater to Rochester throughout the period of this criminal activity, supporting the fact that the discharges of low pH water up the hill did not occur on a constant basis as the government argues. *See* Exhibit AB.[15]

---

[14] Low pH water that is stored on site is primarily comprised of wastewater from vinegar and mustard processes and low pH stormwater collected from process areas during rainfall and snow melt events.

[15] On December 19, 2025, Counsel for Defendant prepared an analysis of the wastewater trucked to Rochester NH before and after the pipe up the hill was capped on August 7, 2023. This analysis demonstrated only a minimal

Mr. Santich stands before this Court, remorseful and embarrassed, in that he directed some employees to send low pH water up the hill as a stopgap to address the lack of capacity to deal with heavy rains and melting snow when it occurred in large volumes. The Company has since dedicated additional tanks to fill the excess capacity generated by the rain and snow melt. Mr. Santich admits that he committed the acts alleged in the offense conduct section of the Plea Agreement and he understands the seriousness of the environmental crime he committed. For the purposes of sentencing, it remains critical under § 3553(a)(1) for the Court to assess actual circumstances of the offense and Mr. Santich's conduct.

Mr. Santich confirms that he hired an excavation company in 2015 to install the buried discharge pipe, which initially transported water to tanks located up the hill behind the Company's facility. Presentence Report ("PSR") ¶ 16. Mr. Santich eventually ordered a crane company to relocate the tanks so they could be repurposed in other areas of the facility. He later hired the same excavation company in May 2017 to extend the buried discharge pipe further up the hill to an old, abandoned railroad bed at the top of the hill behind the facility. *Id.* at ¶ 16-17. Although the pipe pointed generally in the direction of the Souhegan River, it was separated from the river by approximately 1,140 feet – over three football fields.[16] Nevertheless, Mr. Santich recognizes the seriousness of his conduct and his error in judgement, and takes

increase in shipments following August 7, 2023, indicating that the use of the pipe up the hill was intermittent and not constant as the government suggests.

[16] *See* Exhibit 5 at 15, Expert Opinion Report of Dr. Paul R. Krause Regarding the Impact of Discharges of Acidic Wastewater to the Souhegan River, (December 2025).

responsibility for ordering employees to discharge low pH water as described in the offense conduct section of the plea.

In recognition of his misdeeds, Mr. Santich and the Company pleaded guilty to an Information charging Mr. Santich with one count of Knowing Discharge of a Pollutant Without a Permit in violation of 33 U.S.C. §§ 1311(a), 1319(c)(2)(A), and 18 U.S.C. § 2, and charging the Company with three counts of Knowing Discharge of a Pollutant Without a Permit in violation of 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A) on February 24, 2025. Mr. Santich acknowledges the gravity that comes with his felony conviction, and reserves hope that the Court will allow him the opportunity to rectify these circumstances by leading his Company through its environmental compliance obligations while serving a five-year non-custodial term of probation.

## IV. Other Sentencing Considerations: Mr. Santich's Discharge of Low pH Water Did Not Cause Lasting Environmental Harm and is Dissimilar to Other Cases.

In considering the nature and circumstances of Mr. Santich's offense under § 3553(a)(1), the defense presents that despite the seriousness of Mr. Santich's actions, the long-term environmental impact of those actions was negligible to the flora and fauna of the Souhegan River. At the sentencing hearing, the defense is prepared to call Dr. Paul R. Krause as an expert witness and current lead for Impact, Assessment, Biodiversity, Ecology ("IA/BE") for Ramboll Americas Engineering Solutions, Inc. Dr. Krause will be prepared to address whether there was any lasting harm after reviewing the data and making an in person visit to the grounds of the Old Dutch facility. As Dr. Krause concluded:

> "Overall, these results demonstrate that the release of low pH wastewater onto the swale did not cause impairment to the ecological community along the swale or within the Souhegan River. Although low pH wastewater was released periodically from the buried pipe, the results of this analysis demonstrate clearly

that it did not impact the Souhegan River."[17]

Dr. Krause further concluded that the "Discharges from the Pilgrim Foods facility do not constitute an ongoing or potential long-term impact to the biota of the terrestrial habitat or the Souhegan River." *Id.*

a. **A Custodial Sentence Would Result in Unwarranted Disparity Between the Defendant's Punishment and Other Sentences of Persons Similarly Situated.**

Mr. Santich is committed to taking responsibility for his actions and appreciates the opportunity to present additional information to the Court. To that end, the defense suggests that a review of published cases involving similar or worse conduct supports that a sentence of five years of probation with the proposed special conditions for Mr. Santich would avoid the unwarranted sentence disparities that § 3553 requires. A non-custodial sentence would also allow Mr. Santich to direct and implement the eventual recommendations to be received by the Independent Consultant, SCS Engineers, and to dedicate his time to resolving environmental noncompliance.

18 U.S.C. § 3553(a)(6) provides that the Court shall consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." A sentence of incarceration for Mr. Santich would not be consistent with similarly situated individuals in circumstances involving the U.S. Environmental Protection Agency ("EPA") and other applicable regulators.

According to data obtained from the U.S. Sentencing Commission in the past decade, only nine (9) individuals were sentenced in EPA Region 1 (New England) for environmental

[17] *See* Exhibit V at 27, Expert Opinion Report of Dr. Paul R. Krause Regarding the Impact of Discharges of Acidic Wastewater to the Souhegan River, (December 2025).

crimes under U.S.S.G. guideline § 2Q1.3 Mishandling of Other Environmental Pollutants; Recordkeeping, Tampering, and Falsification.[18] Each of the nine criminal matters resulted in sentences consisting of probation without incarceration, all for a period of two years or less. This corresponds with a nationwide trend to impose probation for environmental crimes where there was no lasting harm to the environment resulting from the conduct at issue, as is the case here.

In contrast to the above cases, courts have sentenced only two individual offenders to incarceration in New England during the past 25 years, according to data available on the EPA's Criminal Prosecution Database.[19] As evidenced in the plea agreements and sentencing materials which resulted in these two individual incarcerations, Mr. Santich's conduct is not only dissimilar but the pollutants at issue in those cases were significantly more dangerous and toxic to the environment than those caused to be discharged by Mr. Santich at the Old Dutch facility.[20]

For example, in 2005, in *United States v. Hill*, defendant Franklin Hill was sentenced to a term of five months' imprisonment for violations of the CWA and the Migratory Bird Act after a tugboat and barge he was operating exited a marked channel and struck a rock outcropping, releasing 98,000 gallons of "Number 6" heating oil into Massachusetts' Buzzards Bay and adjoining shorelines.[21] Ultimately, this incident led to the deaths of over 450 federally protected

---

[18] Interactive Data Analyzer, U.S. Sentencing Commission, https://ida.ussc.gov.
[19] Summary of Criminal Prosecutions, U.S. Environmental Protection Agency, https://cfpub.epa.gov/compliance/criminal_prosecution/index.cfm?bct=19&pt=1.
[20] Note that in several instances, discrepancies exist between the sentencing information presented in the EPA's Summary of Criminal Prosecutions and the applicable federal criminal docket. For instance, the EPA database advises that defendant Bradley Beaudoin was sentenced to 6 months incarceration, 12 months' probation, and to pay a $2,000 fine for violations of the CWA. According to the federal docket, Beaudoin was instead sentenced to 12 months' probation with six months home detention, with a $2,000 fine. *United States v. Beaudoin, et al.*, 1:01-CR-119 (D.N.H. 2001). Another example is *United States v. McKissick*. Whereas the EPA database claimed McKissick was sentenced to 4 months incarceration and to pay a $75,000 fine, the federal docket advised that McKissick was sentenced to 12 months' probation with four months home detention, with a $75,000 fine. *United States v. McKissick*, 4:12-CR-40054 (D. Mass. 2012).
[21] *United States v. Hill*, No. 1:05-CR-10111, ECF No. 11 (D. Mass. Sep. 21, 2005).

migratory birds. Hill's employer, Bouchard Transportation Company, ultimately paid $9 million in fines and agreed to pay cleanup costs for over 90 miles of coastline, which exceeded $38 million.[22] Bouchard Transportation Company also faced numerous plaintiffs' suits, and ultimately closed.

In 1991, defendant John Wells was convicted on nineteen counts of knowingly discharging large amounts of zinc and cyanide into the City of Lowell's sewer system over a two-year period.[23] In that case, the defendant operated a metal finishing shop which was found to have discharged approximately 14,000 gallons of metal finishing pollutant into Lowell's POTW over a systemic period. Defendant Wells was sentenced to fifteen months in custody to be served concurrently on each of the nineteen counts and one year of supervised release, plus a $60,000 fine.

The facts presented in the cases above draw a clear distinction in the nature and circumstances of the conduct described in those cases and Mr. Santich's matter. Whereas the matters that involved a custodial sentence involved widespread environmental impact and destruction from dangerous discharges – warranting the need for large scale, costly remediation efforts. In stark contrast, the discharges caused by Mr. Santich were limited in scope, resulted in minimal impact to the environment, and did not result in the need for public funds to be spent on remediation.

In other instances, examples of egregious environmental harms requiring costly and lengthy remediation efforts still resulted in defendants' sentences of probation, without incarceration. In 1997, public employee William Williamson, Jr., foreman of the Signs and

[22] The Maritime Executive, *Tugboat Operator Gets Prison for Buzzards Bay Oil Spill*, The Maritime Executive Sept. 29, 2005, https://maritime-executive.com/article/2005-09-29tugboat-operator-gets-prison-for-buzza.
[23] *United States v. Wells Metal Finishing, Inc.*, 922 F.2d 54 (1st Cir. 1991).

Markings Division for the City of New Haven, Connecticut, ordered city employees to dump approximately 800 gallons of highly flammable toluene, petroleum solvents, and paint wastes into both a public sewer system and a city facility sand pile.[24] Williamson ultimately pleaded guilty to two counts of violating the CWA and was sentenced to probation for a term of two years, and ordered to perform 40 hours of community service and pay a fine of $1,000.

In New Hampshire, in 2001, Bradley Beaudoin, former superintendent of the Troy Waste Water Treatment Plant, and Frederick B. Lawrence, Jr., chairman of the Troy Water and Sewer Commission were sentenced under violations of the CWA to one year of probation with six months home detention with a $2,000 fine, and one year of probation with seven months home detention with a $2,000, respectively.[25] Over a six-year period, defendant Beaudoin allowed raw sewage and wastewater to leak from a Treatment Plant valve and enter the Ashuelot River through an illegal pipe he had installed.

Similarly, in *United States v. McKissick*, defendant Larry McKissick II, owner and president of Charlton Welding and Repair, Inc. of Charlton, Massachusetts, pleaded guilty to negligently discharging approximately 3,200 gallons of diesel fuel into navigable waters of the United States in June 2010.[26] McKissick washed the 3,200 gallons of diesel fuel from a parking lot after a storage tank on his business property released the fuel. McKissick's actions resulted in harm to a nearby residential housing complex as well as wetlands, with the Massachusetts Department of Environmental Protection ("MassDEP") conducting a subsequent six-month cleanup response costing more than $680,000. Despite his conduct and the environmental impact of his actions, McKissick was sentenced to 12 months of probation, four months of which

[24] *United States v. Williamson*, No. 3:96-CR-110 (D. Conn. June 5, 1996).
[25] *United States v. Beaudoin, et al.*, No. 1:01-CR-119, ECF No. 18, 21 (D.N.H. Oct. 10, 2002).
[26] *United States v. McKissick*, No. 4:12-CR-40054, ECF No. 9 (D. Mass. Nov. 15, 2012).

were to be served as home detention, and he was ordered to pay a $75,000 fine.[27]

Additionally, a New Hampshire matter from 2014 (*United States v. Christopher Garrity*) notably reflects the court's preference to resolve these types of matters without incarceration.[28] In *Garrity,* the defendant pleaded guilty to a felony charge of discharging a pollutant without a permit in violation of the CWA and was ordered to pay a $5,000 fine and serve 12 months of probation. Defendant was a yard manager at a scrap metal recycling operation. Garrity was convicted of knowingly discharging polluted recycled spray water containing mercury, iron, copper and other metals directly into the Piscataqua River using a large hose.

Finally, *In re Fleischmann's Vinegar Co.* and related cases actually involved a company that produced a similar vinegar product to that of the Old Dutch facility. The *Fleischman's* matter involved vinegar production and the alleged discharge of unauthorized pollutants but did not result in criminal punishment or incarceration for the offending individuals. Among other allegations, Fleischmann's was sued in the U.S. District Court for the District of Maryland by a nonprofit entity claiming the company violated the CWA by allowing unauthorized pollutants to be discharged into a nearby waterway. Although Fleischmann's maintained a National Pollutant Discharge Elimination System ("NPDES") permit, the Complaint alleged that the company discharged effluents in excess of the permit, discharged unauthorized effluents, and discharged effluents through an unpermitted metal pipe. The Complaint alleged that this activity led to the deaths of approximately 1,000 fish in the stream at issue. Ultimately, the parties settled this matter with Fleischmann's paying over $1.1 million in penalties and the Court issuing a Consent Decree against the company. In separate actions, the company also settled with the State of

[27] *Id.* at ECF No. 25.
[28] *United States v. Christopher Garrity*, No. 1:15-CR-156-SM (D.N.H. Feb. 2, 2016).

Maryland for related offenses and paid a civil EPA penalty. Most notably, and applicable to the instant matter, despite the magnitude of harm caused by Fleischman's actions – including large scale fish deaths – not one of Fleischmann's owners, operators, executives, or employees faced incarceration or any definable criminal punishment. By contrast, Mr. Santich's actions did not result in large kills of sea animals or fish; nor was there any lasting harm as a result of Mr. Santich's conduct.

As illustrated in the chart below, courts have consistently declined to impose terms of incarceration in cases involving violations of similar or greater severity than the conduct at issue here, instead imposing sentences of probation, home confinement, and fines.

| Case Name | Pollutants | Volume / Duration | Defendant's Role | Disposition |
|---|---|---|---|---|
| *United States v. Bass, et al.*, No. 3:04-CR-203 (D. Conn.) | Industrial Wastewater | Unknown amount; discharged weekly | Two employees of a corporate facility discharged wastewater in violation of permit limits. | Pled guilty to 33 U.S.C. § 1319(c)(1)(A). 36 months' probation; $5,000 fine. |
| *United States v. Meyer*, No. 3:08-CR-266 (D. Conn.) | Iron, zinc, copper, and suspended solids | First incident: unknown amount. Second incident: approximately 6,400 gallons. | Company executive responsible for wastewater treatment failed to file mandatory reports with the DEP regarding two discharge incidents that killed hundreds of blue crabs. | Pled guilty to 33 U.S.C. § 1319(c)(1)(A). 12 months' probation; $1,000 fine. |
| *United States v. Drake*, No. 3:11-CR-222 (D. Conn.) | Wastewater slop, diesel fuel, and oil | 13,500 gallons over 9 days | Vessel operator caused the discharge of the pollutants from a vessel under his control. | Pled guilty to 33 U.S.C. §§ 1319(c)(1), 1321(b)(3). $5,000 fine. |
| *United States v. Saunders Asbestos, et al.*, No. 1:90-cr-10263-ADM-2 (D. Mass.) | Asbestos-containing wastewater | Unknown amount | Foreman for asbestos removal company discharged asbestos-laden water into the Charles River. | Pled guilty to 33 U.S.C. §§ 1311(a), 1319(c)(1)(A). 4 months home confinement. |

| | | | | |
|---|---|---|---|---|
| *United States v. McGlory*, No. 3:05-CR-213 (D. Conn.) | Industrial wastewater | Unknown amount | Plant operations manager at photo processing plant knew employees routinely diluted water samples to falsely demonstrate compliance with sewer discharge permit. | Pled guilty to 33 U.S.C. § 1319(c)(4). 12 months' probation; $3,000 fine. |
| *United States v. Cellamare*, No. 10-CR-001-01-SM (D.N.H.) | Nickel, cadmium, copper, and zinc | Unknown amount | Environmental Coordinator for a corporation knowingly submitted semi-annual reports to the EPA that falsely understated the amount of toxic pollutants discharged into a municipal wastewater facility. | Pled guilty to 18 U.S.C. § 1001(a)(1). 36 months' probation; $3,000 fine. |
| *United States v. Faria*, No. 3:14-CR (D. Conn.) | Industrial wastewater | Unknown amount; discharged for nearly 8 years | President and CEO of pharmaceutical manufacturer learned the company was discharging pollutants without a required CT DEEP permit and continued the illegal discharges for nearly eight years rather than securing a permit. | Pled guilty to 33 U.S.C. § 1319(c)(2)(A). 3 years' probation; $30,000 fine. |

These cases, among others, demonstrate an overall judicial preference to reserve custodial sentences for only the most serious crimes resulting in severe and widespread environmental harm. To avoid unwarranted sentencing disparities, Mr. Santich respectfully requests the Court to consider a sentence avoiding imprisonment. A sentence including incarceration for Mr. Santich would likely result in an unwarranted disparity between the cases discussed above and Mr. Santich's conduct. Further, a sentence of probation would allow for Mr. Santich to continue to take the required steps to implement the expected recommendations of SCS Engineers; work toward achieving CWA compliance at the Old Dutch facility; maintain the employment of over 60 staff and employees and support a broad network of suppliers, customers and vendors.

**b. The Guidelines Artificially Overstate the Need for a Custodial Sentence for Mr. Santich.**

Pursuant to 18 U.S.C. § 3553(a)(4), the advisory guideline sentencing range is just one of several factors the Court must consider in imposing a sentence upon the Defendant. In this case, the PSR for Mr. Santich has calculated a total Offense Level of 19, which corresponds to a sentencing range of 30 to 37 months. PSR at 17. This range is higher than the statutorily authorized maximum sentence of three years, and thus the guideline range is 30 to 36 months. *Id*. A custodial sentence of three years for Mr. Santich – the operator and sole executive in charge of the Company – would be tantamount to closing the doors of the Company permanently, with countless other negative impacts on the over 60 employees and their families that rely upon it for employment.[29] No current employee is equipped to operate the Company without Mr. Santich's involvement, and Mr. Santich knows no external investors or purchasers interested in acquiring the business, given the circumstances. *Id.* 18 U.S.C. § 3553(a) mandates that "[t]he court shall impose a sentence sufficient, but not greater than necessary" to fulfill the purposes of the statute. Based on the information contained herein, we ask the Court to impose a sentence of Probation for Mr. Santich because the Guidelines overstate the impact and harm of the offense committed by the Defendant and we ask the Court to consider imposing a sentence

[29] *See* Exhibit I, Character Reference Letter, William McKeon ("I believe that incarceration would have a severe adverse effect on his company by jeopardizing existing customers, new projects and proposals."); *See* Exhibit A, Character Reference Letter, Denice Blanchard ("I live in Mason, New Hampshire … ODM provides local jobs and a tax base for the Greenville, New Hampshire community. Knowing the employees the way I do – they would be devastated to have to relocate… I ask you to consider the impact to the ODM business, employees, and Charlie's family when determining his sentence. Mr. Santich does not deserve a sentence of imprisonment; the impact would be devastating to a lot of people."); *See* Exhibit G, Character Reference Letter, Brittney Hegarty ("At a time when many manufacturing jobs have left New England, Old Dutch Mustard continues to provide stable employment in an economically challenged area. The company offers opportunities to individuals who may not have college degrees or who might otherwise struggle to find work locally. I understand that the business is also a significant contributor to the town's tax base. The livelihood of many families, as well as the economic health of the community, are closely tied to Mr. Santich's leadership and continued involvement.")

consistent with that found in Zone B, allowing for Probation and outside the range calculated in the PSR. *See* § 3553 (c)(2).

**i. U.S.S.G. §2Q1.3(b)(1)(A) Should be Reduced by Two Levels Pursuant to the Departure Allowed in Application Note 4 or by Variance.**

The PSR recommends that Mr. Santich's total offense level be increased by six points under U.S.S.G. §2Q1.3(b)(1)(A) because the offense "resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a pollutant into the environment." The parties agreed that §2Q1.3(b)(1)(A) applies to this case. ECF No. 2, p. 10. However, the parties also agreed that either party may argue for a departure under §2Q1.3, Application Note 4 ("Note 4"). *Id*. The defense contends that a downward variance is appropriate in this instance, either as a departure pursuant to the departure allowed in Note 4, in the 2024 Guidelines, or as a variance under the 2025 Guidelines.

Subsection (b)(1) "assumes a discharge or emission into the environment resulting in actual environmental contamination." U.S.S.G. §2Q1.3(b)(1)(a), cmt. n. 4. Mr. Santich and the Company do not argue the existence of the discharges of the low pH water at issue, but instead rely upon Note 4's advisement that a departure of up to two levels in either direction may be appropriate dependent upon several factors, particularly "the harm resulting from the emission, release or discharge, the quantity and nature of the substance or pollutant, the duration of the offense and the risk associated with the violation." *Id*. Commentary of this nature from the Sentencing Commission is "authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993).

Here, the *de minimis* harm, nonhazardous nature of the substance, and minimal risk associated with this discharge caused by Mr. Santich warrants a two-point downward departure

or variance. Dr. Krause has opined that the discharge from the Old Dutch facility did not constitute an ongoing or potential long-term impact to the habitat of the Souhegan River.[30] Based on both the analysis of pertinent data and his October 2025 visit to the grounds of the Old Dutch facility, Dr. Krause opines that the low pH water discharges had no long-term impact to either the drainage route from the point of origin to the Souhegan River, nor the River itself. [31] Dr. Krause further concluded that downstream plant communities from both the Souhegan River and the Unnamed Stream do not show impact from low pH discharges, and that macroinvertebrate communities in the Unnamed Stream actually indicate improved community health, without degradation of water quality.[32] Most importantly, Dr. Krause's analysis leads him to conclude that "multiple lines of evidence…support the conclusion that any impacts from the discharge were short lived and are not contributing to ongoing degradation of the biota or water quality."[33]

Notwithstanding Mr. Santich's admission that he discharged low pH wastewater and stormwater on more than one occasion; the circumstances support a downward departure or variance of two levels consistent with the spirit of the Guidelines and the guidance of Note 4. The decomposable nature of low pH wastewater supports a variance, as acetic acid is a "weak, highly water-soluble, readily biodegradable organic acid that is not expected to bioaccumulate or persist in either surface water or groundwater."[34] Although this discharge is a pollutant, we contend that the nature of this substance is different than that of other, more toxic substances such as oil, sulfuric acid, human waste and others applicable under the CWA. 33 U.S.C.

---

[30] Exhibit V at 2, Expert Opinion Report of Dr. Paul R. Krause Regarding the Impact of Discharges of Acidic Wastewater to the Souhegan River, Ramboll Americas Engineering Solutions, Inc. (December 2025).
[31] *Id*.
[32] *Id*.
[33] *Id*.
[34] *Id*. at 21.

§§1251-1387.

In other cases, courts have refused to apply the maximum six-point enhancement under § 2Q1.3(b)(1)(a) in circumstances where defendants have discharged far more dangerous substances, in larger quantities and duration than low pH wastewater discharge. For example, in *Panyard,* a defendant was convicted of illegally dumping millions of gallons of untreated industrial liquid waste from its waste treatment, storage, and disposal facility directly into the municipal sewers of Detroit over a 14-month period. The court applied only a four-point enhancement to defendant's offense level, reasoning that "discharged wastes were eventually treated by a POTW, thus reducing harm to the environment." *United States v. Panyard*, No. 07-20037-2, 2009 WL 1099257 (E.D. Mich. Apr. 23, 2009). The court also noted that a four-level enhancement was more appropriate than the maximum of six because the Company "processed non-hazardous materials." *Id.* Similar to *Panyard*, the wastewater associated with Mr. Santich's vinegar and mustard products are non-hazardous, and the underlying discharge caused no lasting harm to the environment.

Accordingly, we respectfully request that the Court reduce Mr. Santich's guidelines calculation by two points from the six points provided under U.S.S.G. § 2Q1.3(b)(1)(A) because the discharges caused by Mr. Santich resulted in no "actual environmental contamination." Note 4. A downward departure or variance of two levels is, therefore, appropriate.

**ii. U.S.S.G. §2Q1.3(b)(4) Should be Reduced by Two Levels Pursuant to the Departure Allowed in Application Note 7 or by Variance.**

The PSR also recommends that Mr. Santich's total offense level be enhanced by four points under U.S.S.G. §2Q1.3(b)(4) because the offense "involved a discharge without a permit or in violation of a permit." The parties agreed that §2Q1.3(b)(4) applies to this case. ECF No.

2, p.10. However, the parties also agreed that either party may argue for a departure under §2Q1.3, Application Note 7 ("Note 7"). *Id*.

Under the 2024 Guidelines, Note 7 provides, in pertinent part, that "[d]epending upon the nature and quantity of the substance involved and the risk associated with the offense, a departure of up to two levels in either direction may be warranted." Referring to Dr. Krause's opinion discussed above, the risk associated with low pH water's long-term impact on the environment is extremely low, and in this instance, there were no long-term effects on the environment as a result of the charged conduct. Accordingly, Mr. Santich respectfully requests this Court to reduce his guidelines calculation by two levels, via a departure or variance under the 2025 Guidelines.

**c. The Court Should Not Apply a Four Level Enhancement for Mr. Santich's Role in the Offense Under §3B1.1(a).**

U.S.S.G. § 3B1.1 permits either a two, three, or four-level enhancement based on the defendant's role in the offense. U.S.S.G. § 3B1.1(a – c). The parties agree that § 3B1.1 applies to this case, but disagree on the applicable subsection.[35] The PSR has applied a four-level enhancement under U.S.S.G. § 3B1.1(a), stating that the "defendant implemented a scheme to unlawfully discharge acidic wastewater and stormwater into the Souhegan River through which he had installed a covert pipe to divert the wastewater and directed at least four other employees, including Bill Horgan, Don Ferretti,[36] Brett Souther and Mike Laganiere, to discharge the

[35] *Plea Agreement of Charles Santich* ¶ 6 (c), ECF No. 2, p. 11 (Jan. 24, 2025).

[36] The government's investigation has continued with Don Ferretti being interviewed as recently as March 18, 2026. During that interview, Ferretti stated, among other things, that when Souther was in Hospice Care, Souther told Ferretti that it was Souther who tipped off the EPA and that when Souther saw agents arrive at the facility he "turned the valve to make the wastewater flow up the hill" on the day the search warrant was executed on August 2, 2023, presumedly due to Souther's disputes with Santich as documented elsewhere. *See* Ex. AA, USEPA CID Investigative Activity Report, Interview of Don Ferretti (March 18, 2026).

wastewater through the underground pipe." PSR ¶ 42. To be clear, Mr. Santich fully acknowledges directing employees to discharge low pH wastewater up the hill, as outlined in the Plea Agreement, but contends that the record fails to support (A) that Mr. Santich's criminal activity involved five or more participants and (B) that his criminal activity was otherwise extensive.

**i. Mr. Santich's Actions Did Not Involve Five Participants.**

A four-point enhancement is inappropriate in this case based on the definition of "participant" under Application Note 1 of § 3B1.1 ("Note 1"). Accordingly, the defense respectfully requests the Court to instead apply a two-point enhancement under § 3B1.1(c). Note 1 defines a "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. §3B1.1, cmt. n. 1. "'Criminal responsibility' is a term of art in the criminal law, connoting a certain culpable state of mind." *United States v. Ribot*, 1999 WL 165919 at 6 (D. Mass.). As the Court is aware, no individual other than Mr. Santich himself has been criminally charged for CWA violations in this matter. Neither the PSR nor the record supports a finding that Messrs. Horgan, Ferretti, Souther, and Laganiere were all "criminally responsible" for the commission of Mr. Santich's offense under the application of Note 1 because these individuals lacked the culpability necessary for the crime at issue. In *Ribot* and similar cases, the Court concluded that because the individuals involved in the crime did not share the defendant's culpable state of mind, "they could not be counted as 'participants' for the purpose of this increase" under § 3B1.1. *United States v. Footman*, 66 F. Supp. 2d 83, 93 (D. Mass. 1999), *aff'd*, 215 F.3d 145 (1st Cir. 2000).

Similar principles apply here. Mr. Santich does not contest his direction to Mr. Horgan and other employees to pump wastewater through the buried discharge pipe and up the hill. PSR

¶ 19. Additionally, Mr. Santich admits that, at times, he instructed Mr. Ferretti and another employee to relay instructions to Mr. Horgan to discharge wastewater up the hill. PSR ¶ 21. However, the Government has failed to prove that Mr. Souther, another employee that the PSR indicates was involved, possessed the requisite culpability for Mr. Santich's criminal actions. While Mr. Souther and other employees may have had ideas about Mr. Santich's crime, "[a] finding that other persons 'knew what was going on' is not a finding that these persons were criminally responsible for the commission of an offense. Willful participation is an essential element of the crime of conspiracy; mere knowledge of a conspiracy does not itself make a person a conspirator." *See United States v. Maloof*, 205 F.3d 819, 830 (5th Cir. 2000) (quoting *United States v. Mann*, 161 F. 3d 840, 867 (5th Cir. 1998)). Mr. Souther himself stated to investigators that he "never used the valve (that sent the wastewater up the hill)" and that he only "observed Ferretti, and Horgan discharging wastewater."[37] The PSR references Mr. Souther only twice, and in no instance provides adequate support of his personal culpability for Mr. Santich's actions. Despite Mr. Santich's direction to Mr. Souther to relay instruction to Mr. Horgan to discharge wastewater up the hill, the PSR and the record do not support a finding that Mr. Souther was criminally culpable for this crime, and he thus should not be considered a participant under §3B1.1.

With respect to Mr. Laganiere, the PSR states that Mr. Santich directed him to make unlawful discharges when Mr. Horgan was unable to do so. PSR ¶ 21. Despite Mr. Santich's direction, Mr. Laganiere explicitly testified that he never discharged wastewater up the hill. ("…[I]f, if he [Mr. Santich] said to discharge it [wastewater], then discharge it, but I never did, I

[37] *See* Exhibit Y, US EPA CID Investigative Activity Report, Interview of Brett Souther, at 1, 3 (May 16, 2024).

always sent it to wastewater."[38] "And I didn't even listen to him [Mr. Santich] anyways, I sent it [wastewater] to get trucked out of there."[39]) The record further supports that Mr. Laganiere's employment with the Company was turbulent, to say the least. Mr. Souther expressed to investigators that "Santich believed the complainant to US EPA was Mike Laganiere. Laganiere had threatened to report Santich to the authorities the second time he was fired. Laganiere was fired for a drinking problem, got sober and was rehired. Laganiere then began drinking again and was fired once more."[40] Company employee records confirm both Mr. Laganiere's consistent performance issues and absenteeism, as well as the multiple chances provided to Mr. Laganiere by the Company in rehiring him. Ultimately, Mr. Laganiere simply stopped showing up for work, without notice, and was subsequently terminated. The Court should infer from the dearth of support in the PSR and the record that Mr. Laganiere (1) was not criminally culpable for Mr. Santich's criminal actions, (2) did not perform any actions in furtherance of Mr. Santich's crimes, and (3) possessed a potential for bias based on his checkered employment history with the Company. Accordingly, Mr. Laganiere should not be considered a participant under §3B1.1.

Despite the PSR's conclusory assertions of these individuals' involvement in Mr. Santich's crimes, nowhere do we find evidence beyond a preponderance indicating criminal culpability on their behalf. *United States v. McDowell*, 918 F.2d 1004, 1011 (1st Cir. 1990) ("there must be a specific finding, based on a preponderance of the evidence, which pinpoints them [participants] with enough particularity to give credence to the upward adjustment.") The PSR is explicit that Mr. Santich attempted to "limit the number of people with knowledge of the

---

[38] *See* Exhibit Z, Grand Jury Testimony of Michael Laganiere, page 10:2-4 (June 12, 2024).
[39] *Id.* at page 12:10-12.
[40] *See* Exhibit X, US EPA CID Investigative Activity Report, Interview of Brett Souther, at 3 (May 7, 2024).

existence of the underground pipe" – a fact in direct conflict with the plain language of §3B1.1(a). PSR ¶ 20. The PSR's basis for finding five criminal participants is insufficient and supports a finding that at least Mr. Souther and Mr. Laganiere should not be considered participants under the guidelines.

Despite the PSR's assertion of Mr. Laganiere's "involvement," he testified that the did not discharge wastewater up the hill, and the record supports that he was terminated for issues related to violations of the Company's policies rather than any potential involvement he had in this matter. Similarly, Mr. Souther's "involvement" was restricted to his general awareness of Mr. Santich's crime – not Mr. Souther's actual participation. Further, without additional evidence, the facts that "multiple employees heard" Mr. Santich order Mr. Ferretti to have Mr. Horgan discharge wastewater and that "several employees knew of its [the buried discharge pipe] existence and purpose" do not support a finding of the requisite criminal participants necessary for a 4-point enhancement under §3B1.1(a).

Relatedly, the Government relies on statements from numerous past employees with well documented instances of performance issues resulting in their termination from the Company. In support of enhancements, the Government cites information derived from interviews with the individuals named above (Horgan, Ferretti, Souther, and Laganiere) as well as August Greer, David Southwick, Davin Plamondon, Jeffrey LaCroix, Patrick Cairney, Steven Johnson, Michael Cucchiara, Rodney Reid, and Patrick Richard. For the Court's awareness, the Company notes the following information based on Company records: Mr. Greer was terminated from the Company in February 2024 after failing to arrive at work and failing to notify his supervisor. Previously, the Company issued several warnings to Mr. Greer for violating the Company's policy on absenteeism. The Company employed Mr. Southwick for only five months, and he was

terminated by his manager for poor performance. Mr. Plamondon resigned from the Company after finding a new job in October 2021 – nearly two years before the Government's search warrant in August 2023. The Company terminated Mr. LaCroix for performance issues after he repeatedly failed to follow instructions at the facility. Like Mr. Plamondon, he last worked at the Company in fall 2021. Mr. Cairney worked for the Company for less than a year and resigned from his employment nearly a decade ago, in September 2016. In his period of employment, Mr. Cairney received a formal warning after he flooded the plant by leaving cooler water running overnight. The Company terminated Mr. Johnson in 2021 after only four months of employment due to him abandoning his position and failing to notify his manager. Similarly, Mr. Cucchiara worked less than a year for the Company, and was terminated in fall 2021 for violating the Company's policy on absenteeism. Mr. Reid abandoned his position and was subsequently terminated in December 2022. Lastly, Mr. Richard was terminated by the Company's plant manager in 2020 for repeated instances of insubordination and misconduct. In light of the Government's reliance on these individuals' statements in support of enhancement, Mr. Santich and the Company believe this employment history to be relevant information concerning their potential for bias and unreliability.

In sum, Mr. Santich's conduct did not involve five criminally culpable participants, rather, he made concerted efforts to keep knowledge of this matter between himself and one other primary person, Mr. Horgan. Although the PSR summarily states that "[o]ther former employees of Old Dutch reported their knowledge of the illegal discharges based on observations they made at the facility and conversations they had with employees who were directly involved in the discharges, including Bill Horgan," the PSR does not name these former employees and does not attribute the knowledge of intentional violations of the CWA to Messrs. Ferretti,

Souther, and Laganiere. PSR ¶ 21. Mr. Santich's activity was limited in scope, duration, and restricted to a single facility in Greenville – wholly in opposition to the extensive universe of organized, widespread criminal schemes contemplated by the Guidelines.

**ii. Mr. Santich's Actions Were Not "Otherwise Extensive" Pursuant to U.S.S.G. § 3B1.1(a).**

In the Addendum to the PSR, it is suggested that Mr. Santich's scheme was extensive based on three factors: (1) Mr. Santich's hiring of the excavation company to install the pipe in 2015, (2) hiring the excavation company to extend the pipe in 2017, and (3) Mr. Santich's efforts to keep the existence of the buried pipe quiet amongst his employees.[41] This information is insufficient to support a finding that Mr. Santich's criminal activity was "otherwise extensive." The Plea Agreement is clear that Mr. Santich initially hired the excavation company in 2015 to install the buried discharge pipe "to transport water to tanks located up hill and behind the facility."[42] Nowhere does the record support a finding that this initial activity represents criminal intent on behalf of Mr. Santich. While Mr. Santich indeed ordered the excavation company to extend the pipe in 2017, this was done in response to the Company relocating the tanks to another part of the facility which were then repurposed. *Id.* Lastly, any effort of Mr. Santich to conceal his crime does not amount to finding criminal activity to be otherwise extensive. If anything, the fact that Mr. Santich "directed only a few [employees] to divert the wastewater through the pipe" is supportive of the simplicity and narrowness of Mr. Santich's criminal activity. Addendum to the Presentence Report, page 20. "An 'otherwise extensive' finding, however, must be warranted by 'the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme.' "

---

[41] Addendum to the Presentence Report at 20 (Mar. 20, 2026).
[42] Plea Agreement of Charles Santich at 5.

*United States v. Van*, 87 F.3d 1, 4 (1st Cir. 1996) quoting *United States v. Dietz,* 950 F.2d 50, 53 (1st Cir.1991); *see also United States v. Graciani,* 61 F.3d 70, 76 n. 7 (1st Cir.1995).

For the reasons above, counsel for Mr. Santich respectfully requests the application of §3B1.1(c) in this instance, enhancing Mr. Santich's total offense level by two points.

**d. The Court Should Not Apply a Two-Level Enhancement For Abuse of a Position of Trust Under § 3B1.3.**

The abuse-of-trust enhancement under U.S.S.G. § 3B1.3 has been inappropriately applied under these circumstances for several reasons, not the least of which is the Government's inability to meet its burden to prove that Mr. Santich occupied a "position of public or private trust" as envisioned under the guidance of U.S.S.G. § 3B1.3, cmt. n. 1. The First Circuit has cautioned that § 3B1.3 is a narrow enhancement, reserved for roles that entail substantial discretionary judgment and materially reduced supervision, not merely access or opportunity. *See United States v. Stella*, 591 F.3d 23 (1st Cir. 2009). Application Note 1 to § 3B1.3 provides examples of the kinds of matters this enhancement is typically reserved for, to wit "embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination." U.S.S.G. § 3B1.3, cmt. n. 1. These examples reflect the tendency, but not the requirement, of courts to reserve this enhancement for defendants entrusted with fiduciary-like power and control over others' assets and interests – not for run-of-the-mill small business owners of long standing, family-owned businesses in environmental cases.

The application of this enhancement is viewed differently across districts. In the District of New Hampshire, only one case has analyzed the application of an enhancement under § 3B1.3. *See United States v. Wilson*, 887 F. Supp. 2d 341 (D.N.H. 2012). In *Wilson*, Judge

Laplante held that a two-level enhancement was warranted for defendant abusing a position of trust at his employer after defendant pleaded guilty to three counts of wire fraud. *Id*. Although both defendant and the Government objected to the U.S. Probation Office adding this two-level enhancement, the Court did not, holding that "this court sees no reason to follow the line of cases requiring a "trust relationship" between the defendant and victim." *Id*. at 345. In holding that the Guidelines did not mandate a trust relationship between defendant and victim, the court relied upon *Sicher* from the First Circuit that held a two-level enhancement under § 3B1.3 was warranted for a defendant who pleaded guilty to ten counts of uttering forged securities, ten counts of health care program theft, and six counts of income tax evasion in her employment as the sole administrative assistant and secretary to an ophthalmology surgeon. *United States v. Sicher*, 576 F.3d 64 (1st Cir. 2009).

In *Sicher*, the record showed that defendant "used her position of trust to conceal her offenses" from her employer, and the Circuit Court dismissed defendants argument that there must be a fiduciary or fiduciary-like relationship between the defendant and victim of the defendant's fraud, stating in a footnote "[t]his is not the law of our circuit, and we reject the argument." *Id*. at FN.5. In dismissing the necessity for a trust relationship, note that both *Wilson* and *Sicher* involve defendants charged with financial crimes similar to the examples provided in Note 1 of § 3B1.3 – not environmental matters of limited impact to employees like the charge for which Mr. Santich entered into his guilty plea.

Other circuits, including the Second, Third, Fourth, and Eleventh, have reached different conclusions, limiting the applicability of § 3B1.3 enhancements to those cases in which the defendant occupies a position of trust with the victim. *See e.g., United States v. Broderson*, 67 F.3d 452 (2d Cir. 1995) ("The government's theory seems so far reaching that it might cause

virtually anyone who is commanded by statute to make an accurate report to the government to be subject to a Section 3B1.3 enhancement. All taxpayers who file false tax returns, for example, might be included. We believe that it is fairly obvious that the Sentencing Commission harbored no intent that the enhancement be so sweeping."). While we accept the prior holdings of cases within the First Circuit, we are inclined to note the differing interpretations of other circuits, especially with respect to the kinds of crimes at issue.

Based upon consideration of the overall case analysis in the broader circuit review, we submit that Mr. Santich did not occupy a position of public or private trust. The Government relies upon only two cases in support of applying the two-point enhancement and the PSR provides two additional cases from outside the First Circuit for support.[43] Each of these cases can be distinguished from Mr. Santich's matter. The Government first cites *George*, a First Circuit case in which a defendant was convicted of conspiracy and embezzlement of federal funds granted to a state agency. *United States v. George*, 841 F.3d 55 (1st Cir. 2016). In this case, the court evaluated the defendant's position of trust in relation to the victim, a state-funded regional bus transit authority, and determined the defendant occupied a position of trust based on the defendant's control and misuse of public funds enabled by his role, again showcasing the financial nature of this enhancement as exemplified in Application Note 1. *Id.* As a private businessperson, Mr. Santich was not the recipient of public funds and did not possess or violate any fiduciary-like responsibilities owed to the town of Greenville, the state of New Hampshire, the federal government, or the public at large.

The Government next relies upon *Pruett* to support its argument for enhancement of Mr. Santich's sentence. *United States v. Pruett*, 681 F.3d 232 (5th Cir. 2012). Note the Government

---

[43] Addendum to the Presentence Report at 7.

extended its reach to the Fifth Circuit for support, as the First Circuit has not applied § 3B1.3 enhancements in CWA cases. As such, *Pruett* is not binding on this Court or on the First Circuit. In *Pruett*, defendant was Chief Executive Officer ("CEO") and president of a massive wastewater conglomerate in Louisiana consisting of two companies and twenty-eight wastewater facilities. After a ten-day trial, the jury returned a guilty verdict against the individual defendant and his company for a knowing violation of effluent limitations, a guilty verdict for a knowing violation of the record keeping requirement at all facilities, and a guilty verdict against the individual defendant for a negligent violation of operation and maintenance requirements. *Id*. at 237. The Fifth Circuit affirmed the district court's application of a two-level enhancement under § 3B1.3, holding that defendant used his position as President and CEO to facilitate the commission of the offenses. *Id*. at 249. In comparing the individual defendant in *Pruett* to Mr. Santich, the scope of public impact alone (twenty-eight wastewater facilities versus Mr. Santich's single operation) should factually distinguish the magnitude of public impact at issue in these cases, disregarding the First Circuit's silence on the issue. Further, the Pruett defendants, although privately owned, were essentially providing a public good and service through the provision of clean water and wasterwater treatment – typically the responsibility of a municipality. Additionally, the individual defendant in *Pruett* was convicted of three felonies after putting the Government and the district court through the entire trial process and refusing to take responsibility for any of his or the company's actions – significantly dissimilar to Mr. Santich pleading guilty and accepting responsibility for his crime. The underlying facts are distinguishable as well. Mr. Santich's conduct was limited to a single facility when circumstances involved overwhelming rain or snow melt.

Lastly, the PSR cites *Snook* and *Kuhn* as cases where Circuit Courts have affirmed the

application of abuse of trust enhancements to 33 U.S.C. § 1319 offenses. *See* Addendum to the Presentence Report, page 7; *United States v. Snook*, 366 F.3d 439 (7th Cir. 2004); *United States v. Kuhn*, 345 F.3d 431 (6th Cir. 2003). In *Snook*, a jury found the Environmental Manager of a petroleum refinery guilty of conspiring to defraud the federal government by violating the CWA after the refinery discharged over one million gallons of processed wastewater every day into a sewer system that flowed into a water treatment plant of Chicago. *See Snook*, 366 F.3d 439, 442. In *Kuhn*, defendant was a public employee and superintendent of a municipal water treatment plant, convicted by a jury of knowingly causing plant workers to improperly dispose of sewage sludge, knowingly caused sewage sludge to be discharged into the Saginaw River, ordering employees to falsify test results, and submitting discharge monitoring reports containing false information. *See Kuhn*, 345 F.3d 431, 433. Both *Snook* and *Kuhn* contain facts dissimilar from this matter, in both the scope of the environmental harm at issue and the relationship between defendants Snook and Kuhn with relevant regulators. In *Kuhn*, defendant was a superintendent of a municipal POTW that was providing a public service – unlike Mr. Santich or the Company. The PSR identifies several instances where Mr. Santich, as president and owner of the Company, submitted Stormwater Pollution Prevention Plan ("SWPPP") site maps to the EPA that did not include the buried discharge pipe. PSR ¶ 29. This activity, which Mr. Santich certainly regrets, does not rise to a level warranting an abuse of trust enhancement based on the circumstances and case law discussed above. Accordingly, the defense respectfully requests the Court reject this two-point enhancement under § 3B1.3.

## V. Incarceration is Unwarranted for Mr. Santich As a First-Time, Non-Violent, Zero-Point Offender.

Congress directed the Sentencing Commission to ensure that the Guidelines "reflect the general appropriateness of imposing a sentence other than imprisonment" for qualifying first-

time, non-violent offenders. 28 U.S.C. § 994(j). When Congress gives the Commission a specific directive, the Commission "must bow to the specific directives of Congress." *United States v. LaBonte*, 520 U.S. 751, 757 (1997). In Amendment 821, the Commission implemented that directive by creating § 4C1.1, which it described as informed by recidivism data concerning zero-point offenders.

U.S.S.G. §4C1.1(a) provides a two-level reduction in offense calculations for first time, non-violent offenders, and is commonly known as the Zero-Point Offender Adjustment. First implemented in the Guidelines in November 2023, this adjustment is designed to address the significant percentage disparity in recidivism between those offenders with zero criminal history points (26.9%) compared to offenders with even a single criminal history point (42.3%).[44] As evidenced in Amendment 821, the Commission made this change to "reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense[.]" 28 U.S.C. § 994(j).

But § 4C1.1 is also a gating provision. Section 4C1.1(a)(10) makes a defendant ineligible if the Court applies an aggravating-role adjustment under § 3B1.1. In practical terms, an organizer-or-leader finding does not merely increase the offense level; it also triggers categorical disqualification from the two-level zero-point reduction, producing a combined swing of six offense levels. By tying § 4C1.1 eligibility to a § 3B1.1 finding, the Commission narrows the practical effect of Congress's directive in § 994(j) through a categorical bar.

Here, Mr. Santich and his zero criminal history score satisfies all enumerated criteria

[44] *See* U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, p. 78, available at http://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023 ("2023 4C1.1 Amendment").

required to qualify for this reduction. However, the PSR erroneously applied a four-level aggravating role in the offense enhancement under §3B1.1. This application unjustly inflates Mr. Santich's offense level by four points and renders him ineligible for this zero-offender two-level reduction – a significant six-point disadvantage which substantially increases Mr. Santich's potential sentencing range.

Strikingly, conduct of Mr. Santich's kind was not envisioned by the Commission in their implementation of §4C1.1(a)(10) and (11), as they adopted language nearly verbatim from the congressionally-established "safety valve" criteria of U.S.C. §3553(f)(4) tailored specifically to drug offenses ("…the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act"). 18 U.S. Code § 3553 (f)(4); *See* 2023 4C1.1 Amendment, at 80 ("The Commission was also informed by existing legislation, including congressionally established criteria for the statutory safety valve at 18 U.S.C. §3553(f).") Thus, a statutory provision narrowly tailored for drug offenders has now been grafted onto all offenses – including CWA violations – affecting all zero-point, non-violent offenders like Mr. Santich.

At a minimum, the Court should account for that policy through a downward variance equivalent to the two levels to Mr. Santich, or otherwise reflect it in the final sentence, so that the sentence remains anchored to empirical risk, proportionality, and Congress's directive favoring non-incarceration for appropriate first-time, non-violent offenders. *See Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).

## VI. Financial Impacts on Old Dutch.

*See* Under Seal Addendum.

## VII. Compliance Improvements

As the Court is aware, the Company's plea agreement incorporates an ongoing Administrative Order for Compliance Issued Upon Consent ("AOC") with the EPA on January 16, 2025. This AOC has been incorporated into the Environmental Compliance Program ("ECP") set forth in the Company's Plea Agreement.[45] Notably, the AOC is composed of five major components designed to identify and address all potential CWA violations at the facility – which includes both violations as described in the Plea Agreements as well as violations associated with the Unnamed Brook, which go beyond the scope of this case. These five components include (1) selection of an independent consultant, (2) environmental and engineering investigation and analysis of the Company's facility to identify all sources of CWA violations, (3) identification and design of corrective actions in a work plan, (4) implementation of the work plan, and (5) satisfactory completion of the work.[46] The Company has already made significant progress, having hired SCS Engineers in May 2025 and EPA approving its scope of work for the engineering and environmental investigation on September 17, 2025. The Company has worked diligently to support SCS Engineers' investigation by providing necessary facility records, facilitating SCS Engineers' visits to the Company's facility in December 2025 and January 2026 to conduct inspections and environmental sampling, and participating in monthly status calls with SCS Engineers and EPA. The Company is committed to continuing work with SCS Engineers to make long-term improvements to its environmental operations.

---

[45] *See* ECF No. 3 at 31-63 (Exhibit 1 to Environmental Compliance Program and Environmental Ethics Program).
[46] *See* ECF No. 3 at 22 (Attachment A to Plea Agreement).

The AOC and ECP are designed to implement improvements at the Company over a period of years. The ECP states that the Company "shall complete all Corrective Action no later than four years and six months following the start of the five-year term of Probation" and that satisfactory completion of the ECP means "completion of all Corrective Actions to the satisfaction of the United States, followed by a period of 6 months without a CWA violation and discharge of pollutants into waters of the United States." *See* ECP ¶ 5(b)-(c).

Despite the long-term nature of this process, the Company has taken significant strides to improve environmental compliance in the near term, as described below:

**a. Environmental Ethics Program ("EEP")**

As outlined in Attachment A to the Plea Agreement, the EEP requires the Company to implement a system to prevent and detect criminal conduct and promote an organizational culture that encourages ethical conduct and compliance. The Company has already successfully implemented this program, despite the Plea Agreement allowing for implementation within 45 days of sentencing. As part of this program, the Company conducted a comprehensive review of its policies and procedures, working alongside its environmental consultant to fully update its Environmental Compliance Training, Onboarding Environmental Awareness Survey, and Plant Safety Rules and Regulations for Contractors. The Company memorialized these documents and circulated them amongst current employees and is providing refresher training with current employees based on these updated documents.

**b. Red Flag Reporting**

Additionally, the Company has implemented an external whistleblower and ethics hotline system, hosted by Red Flag Reporting, available to all employees and contractors to

anonymously report instances of environmental non-compliance to Company leadership, as well as to the Company's outside counsel through Red Flag Reporting's portal management system. This system allows for complainants to communicate anonymously, if they chose to, throughout all stages of the reporting process. The option to report such claims to outside counsel provides additional stability for the process. *See* Attached Exhibits Q, R, S, and T, for copies of referenced compliance materials.

## VIII. Conclusion

For the reasons set forth above, Mr. Santich and the Company respectfully request that the Court order a sentence of probation for a period of five years, in addition to the fines and special conditions requested for both the Company and Mr. Santich outlined above at the beginning of this Memorandum. This sentence takes into account Mr. Santich's commitment to adhere to the requirements outlined with the EPA and other regulators and the terms of the Plea Agreements to bring the Company into full environmental compliance. As evidenced by Mr. Santich's felony guilty plea and the information presented in this Sentencing Memorandum, the weight of the consequences of his actions is severe and hangs justly above his head. He fully realizes the error of his ways, and he has committed himself and his Company to rectifying his mistakes and making whole scale improvements to insure the Company's survival into the future. If he is incarcerated, the Company could fail and the greater efforts to achieve compliance will be defeated. Should Mr. Santich be granted probation with the special conditions outlined above, the incentives are many for him to succeed. If Mr. Santich were to fail and otherwise not complete the special conditions required, he is aware that the Department of Justice could move to find him in violation of the terms of probation and ask to have him put in custody. To best serve the interests of all involved parties, that is, the Government, Mr. Santich, the Company, the

Company's employees and their families, the Town of Greenville's tax base, the public located near the Souhegan River, and this honorable Court, the defense submits that a non-custodial sentence for Mr. Santich best satisfies the interests of justice in this matter. A sentence of five years' probation, along with the numerous conditions and requirements already imposed upon Mr. Santich and the Company, allows him the opportunity to deliver what is rightly sought by all parties: that is, a compliant, functional, and environmentally sound manufacturing company providing fair wages and benefits to over 60 families living in southern New Hampshire.

Dated: March 30, 2026

Respectfully submitted,

CHARLES SANTICH and OLD DUTCH MUSTARD CO., INC., d/b/a PILGRIM FOODS, INC.

By their attorneys,

*<u>/s/ Nathan P. Warecki</u>*
Nathan P. Warecki (NH Bar No. 20503)
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101
Tel: (603) 628-4000
nwarecki@nixonpeabody.com

Mark D. Lytle (admitted pro hac vice)
799 9th Street NW, Suite 500
Washington, DC 20001
Tel: 202.585.8435
mlytle@nixonpeabody.com

Mathew Todaro
VERRILL DANA, LLP
1 Portland Square, Floor 10
Portland, Maine 04101
mtodaro@verrill-law.com

**CERTIFICATE OF SERVICE**

I, Nathan P. Warecki, hereby certify that a copy of the foregoing was filed electronically and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

*/s/ Nathan P. Warecki*
Nathan P. Warecki