UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA

v.

CHARLES SANTICH and

OLD DUTCH MUSTARD CO., INC.,
d/b/a PILGRIM FOODS, INC.,

Defendants.

No. 1:25-cr-00002-LM-TSM-01/02

UNITED STATES'S OBJECTION TO DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR A DOWNWARD DEPARTURE AND/OR VARIANCE

The United States respectfully objects to the defendants' sentencing memorandum and motion for a variance and/or departure. (ECF No. 36.) For the below reasons and the reasons in the government's sentencing memorandum, a below-guideline sentence is not warranted. The Court should sentence Charles Santich to 36 months' imprisonment and impose $2 million in fines.

## I. ARGUMENT

### A. Santich's Crime Caused Environmental Harm and the Court Should Not Depart or Vary on This Basis

The defendants seem to concede, as they must, that their years-long repetitive discharges of acidic wastewater into the Souhegan River caused actual environmental harm. But they contend they did not cause "lasting harm." (Def. Sent. Mem. at 10-11, 19-20.) In support, they rely on their hired expert, Dr. Paul Krause, to assert that the "long-term environmental impact" caused by their criminal offenses "was negligible to the flora and fauna of the Souhegan River." (*Id.* at 10.) Dr. Krause's opinion, however, is contrary to the evidence. As laid out in the PSR and in the reports prepared by EPA Toxicologist, Dr. Kristen Keteles, the defendants' crimes have had a long-term negative environmental impact. (PSR ¶¶ 30-32; Exs. 4 & 5, Dr. Keteles Expert Report & Rebuttal Report; *see also* Exs. 6 & 7, Buttrick & Ritz Impact Statements.)

The harmful effects of low pH to aquatic life are well documented and discharges like Santich's that have high levels of acetic acid are themselves toxic to aquatic life. In addition, fluctuating pH (like that caused by Santich's illegal discharges) is also detrimental. These types of discharges cause degradation to the habitat and loss of biological diversity. (Ex. 4 at 3, 5-7, 13; Ex. 5 at 2, 8-9.) Santich was well aware of the risk of long-term harm from the extensive efforts by EPA and NHDES to monitor and improve the Unnamed Stream. For example, the macroinvertebrate community in the Unnamed Stream slightly improved in 2022 when there were fewer discharges to that stream (which, notably was in the midst of Santich's illegal discharges into the Souhegan). But even then, sewage fungus continued to persist, and the biological integrity of the stream remained impaired due to the history of acidic discharges. (Ex. 4 at 3, 8-11.)

Dr. Krause improperly relies on chemical recovery (*i.e.*, pH levels) and the presence of the fastest recovering biological organisms as evidence of ecological recovery. But chemical recovery, such as improved pH levels, precedes biological recovery of an ecosystem by years to decades. It can take decades for an aquatic ecosystem to recover from acidification, including episodic acidification like that done by Santich. This is further evidenced by the lack of pH sensitive aquatic life in the area of Santich's acidic discharges. (Ex. 5 at 5-7, 9-13, 21-22.)

Santich's discharges likely caused additional harm, including to fish and the animals and people who consume them. As Dr. Keteles points out, "the section of the Souhegan River near ODM is listed as impaired as of 2024 due to low pH, dissolved oxygen, mercury, iron, aluminum, and lead." (Ex. 4 at 14; *see also id.* at 3, 7, 11.) Santich's discharges are a likely cause of this impairment as they "could contribute to the impairment due to mercury, iron, aluminum and lead since low pH increases the solubility of these metals which may be from natural or other anthropogenic sources." (*Id.* at 14-15.) And, "[b]ecause low pH enhances the conversion of

mercury to a form that accumulates in tissue, it's likely that the discharges contributed to conditions that resulted in a mercury fish consumption advisory." (*Id.* at 15-16.)

Santich's crime also caused harm by preventing recovery from the damage done by Old Dutch's long history of polluting the Souhegan River. Old Dutch has a documented history of fish kills and other harm to the river. (*e.g.*, PSR ¶ 13; Ex. 4 at 2-3, 12; Ex. 5 at 20.)[1] Recovery of macroinvertebrates and fish takes decades, and the ecological community may never fully return to its original condition. Once sensitive species are removed from an ecosystem due to a stressor like acidification it is difficult for them to repopulate even when the acidic discharges stop. This is because low-pH tolerant species that now occupy the habitat can outcompete the sensitive species and prevent their re-establishment. Such changes then influence the presence of the fish species that consume these macroinvertebrates, thereby slowing the recovery of fish populations. Santich's crime inhibited this recovery, causing long term harm. (Ex. 4 at 2-3, 11-17; Ex. 5 at 2-3, 21-23.) As Dr. Keteles explained:

> Discharges from ODM resulted in fish kills in the Souhegan River in the past and the long-term discharges that continued likely caused acid-sensitive species to become expatriated in the Souhegan River near the discharge swale and downstream of the confluence with the unnamed stream. The documented impacts to the Souhegan River from the discharges in the unnamed stream demonstrate that discharges from ODM impact the Souhegan River. The low pH discharges from the swale continued to impact the Souhegan River.

Ex. 4 at 17; *see also id.* at 12 ("The low pH and fluctuations in pH from the discharges would prevent the recovery of the dace populations and is likely why recent fish kills were not observed in recent years.").

---

[1] Dr. Krause mistakenly concluded there was no evidence of Old Dutch causing fish kills by confusing NHDES's reports of kills of two fish *species* in the Souhegan River as referring to two dead fish *specimens*. (Santich PSR Add. at 9-10; Ex. 5 at 20 ("Both reports clearly state that the fish kill was comprised of two ***species*** of fish not two ***specimens***. The biological definition of species is a group of organisms that share similar characteristics and can interbreed and produce fertile offspring. A specimen is a single individual organism. Dr. Krause appears to confuse these important terms . . . .").

In contrast, Dr. Krause's failure to adequately explain his methodology and his use of irrelevant, incomplete, and selective information undermines the reliability of his conclusions. (*See* Ex. 5 at 2-5, 9-14, 22-23.) As Dr. Keteles explained in her rebuttal report:

> The continued discharge of acidic waste by Pilgrim Foods through the Unnamed Stream or the swale continued to cause fluctuations of pH in the Souhegan River to the detriment of the stream health. Dr. Krause's use of inappropriate statistical methods and cursory analysis of biological data without proper context conceal the true impacts of the discharges from Pilgrim Foods.

*Id.* at 23.

1. <u>The Court Should not Depart or Vary based on the 2024 Guideline Application Notes</u>

Relying on Dr. Krause's conclusions, Santich asserts that, because the defendants' harm was "*de minimus*," a downward departure or variance is warranted per application notes 4 and 7 in the 2024 guidelines. (Def. Sent. Mem. at 19-22.)[2] This argument is without merit.

As discussed already, Dr. Krause's conclusions are incorrect. As to application note 7, the 2024 guidelines contemplate an upward or downward departure "[d]epending upon the nature and quantity of the substance involved and the risk associated with the offense." Here, Santich knew well the risk of harm his illegal discharge operation could cause. Indeed, he had years of experience interacting with EPA and NHDES who were trying to mitigate the harm that Santich and Old Dutch caused (and were causing) in the Unnamed Stream due to their acidic discharges. Though the government is not seeking an upward departure or variance, given the circumstances here—particularly Santich building the infrastructure needed to routinely and efficiently dump acidic

[2] Santich's plea agreement allows either party to seek certain departures found in the 2024 Guidelines application notes, which have since been removed. "In deleting these formal departure provisions, the Sentencing Commission noted that their removal would likely be 'outcome neutral' as 'judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts, or any other relevant factors, to impose a sentence outside of the applicable [G]uideline range as a variance under18 U.S.C. § 3553(a).'" *United States v. Mello*, 164 F.4th 120, 139 (1st Cir. 2026). The Court should therefore consider these now-deleted departure provisions in determining whether a variance is appropriate.

wastewater into the Souhegan river—one may well be warranted. A downward departure or variance is not appropriate.

As to application note 4, in addition to wrongly minimizing the harm, Santich ignores the other three factors listed. Application note 4 provides for an upward or downward departure depending on "the harm resulting from the . . . discharge, the quantity and nature of the substance or pollutant, the duration of the offense and the risk associated with the violation." Each of these factors weighs against a downward departure.

Santich discharged his manufacturing wastewater and contaminated ground and stormwater for more than six years. This is a period of *lengthy duration*, resulting in a *substantial quantity* of a *highly acidic* pollutant being pumped into the Souhegan River. By his own forfeiture estimate, Santich pumped *at least* a year's worth of wastewater into the Souhegan River. (Def. Ex. AB.)[3] Of course, the exact amount the defendants discharged is unknown because of Santich's extensive efforts to conceal his crime and discharges from NHDES and EPA. In fact, but for the efforts of NHDES and EPA-CID finding the discharges and pipe, Santich might *still* be pumping his wastewater into the river. Finally, while Santich disputes the long-term environmental impact of his crime, he agrees that his repeated acidic discharges caused some harm and, as discussed, cannot credibly contest the "risk associated with the violation." *Cf. United States v. Tuma*, 738 F.3d 681, 692 (5th Cir. 2013) (circuit lacked jurisdiction to review denial of departure with no direct evidence of harm and where "district court clearly considered the departure and chose not to apply it in light of the quantity of the discharges involved.").

[3] Santich's estimate of approximately 292 avoided wastewater shipments exceeds the actual number of shipments Old Dutch sent over the course of the entire year in 2022 (288 truckloads). Notably, the number of shipments of wastewater increased in 2024, after the illegal pumping stopped. (Def. Ex. AB at 2.)

The case cited by the defendants, *United States v. Panyard*, 2009 WL 1099257 (E.D. Mich April 23, 2009), also demonstrates why a downward departure or variance is *not* warranted here. In that case, the president and general manager of an industrial waste treatment, storage, and disposal facility was convicted of discharging non-hazardous wastewater to the municipality's publicly owned treatment works ("POTW"), which is comprised of the sewer system and wastewater treatment plant. Unlike Santich's discharges, these discharges are known as "indirect discharges." 40 C.F.R. 403.3(i).

As here, in *Paynard* the parties agreed to the 6-level enhancement for repeated discharges but the district court granted the defendant's request for a 2-level departure from the guidelines. The court did so for two reasons: (i) the wastewater contained non-hazardous substances and (ii) *the wastewater was treated by the POTW* before being discharged, thus reducing the overall harm to the environment. In contrast, here there was no intervening treatment or dilution to prevent environmental harm. Rather, Santich repeatedly discharged highly acidic wastewater *directly* into the Souhegan River without intervening treatment to reduce its harmful impact.

Given Santich's conduct, the risk of harm inherent in his criminal conduct, and the actual harm he caused, the Court should deny the defendant's motion for a departure or variance.

**B. <u>The Court Should Reject the Defendant's Other PSR Objections</u>**

1. <u>The PSR Correctly Applied the 4-Point Organizer Leader Enhancement and Found That Santich is not a Zero-Point Offender</u>

The defendant asserts that the 4-point organizer leader enhancement under § 3B.1 does not apply because though his crime involved more than five people, they "did not share the defendant's culpable state of mind." (Def. Sent. Mem. at 23.) He also asserts that his crime was not "otherwise extensive." (*Id.* at 28-29.) These arguments fail.

The defendant concedes the offense involved three criminally responsible participants:

himself, his maintenance employee, and Employee 1. *See United States v. Tejada-Beltran*, 50 F.3d 105, 113 n.9 (1st Cir. 1995) ("The defendant himself can be counted as a participant for purposes of the numerosity requirement."); USSG 3B1.1 app. n.1 ("A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."). In addition, Santich involved one of his plant managers in the offense, who confided to an employee that "when wastewater got too full or if they had a big spill . . . they could pump it up the hill if they wanted to." (Santich PSR Add. at 4.) The owner of the excavation company also shared Santich's culpable state of mind (or at the very least was willfully blind) when he installed the discharge pipe, built the swale, and altered his proposal to conceal that work. (Govt. Sent. Mem. at 6-11.) Finally, at least two employees indicated that the company HR Manager knew of the discharge pipe, and another explained her role in concealing information from the company's environmental consultant; the HR manager also worked with Santich, and the company's consultant and lawyers to submit documents to EPA that concealed the illegal discharge pipe and swale. (Def. Ex. X at 2; Def. Ex. AA at 4; PSR ¶ 29; Santich PSR Add. at 2-3.)[4] These six participants suffice for the enhancement.

In addition, the defendant wrongly contends two other participants (included by the Probation Officer), Employee 2 and Employee 3, did not share a culpable state of mind. (Def. Sent. Mem. at 24-26.)[5] Employee 2 admitted to investigators that Santich instructed him to tell Santich's

---

[4] Ex. 8, HR Manager Interview, at 3 ("[HR Manager] overse[e]s the paperwork on environmental matters. For the details of any environmental issues, she either deals with Environmental Consultant . . . , Santich or their lawyers."); Ex. 9 (2021 SWPPP excerpt listing HR Manager's environmental responsibilities).

[5] The defendant also asserts that he fired many of the employees interviewed by the government and recounts some of their purported employment history in an apparent effort to discredit their accounts of Santich's conduct and the goings on at the company. (Def. Sent. Mem. at 26-27.) To be sure, these interviews reflect the employees' different perspectives and should be considered in light of all of the evidence. And the government does not dispute that Santich fired his employees for many reasons. Investigators spoke with employees who worked at Old Dutch over a span of years. Not all of them overlapped at the company and they did not all know each other.

(continued...)

maintenance employee to pump up the hill. (Ex. 10 at 2 ("[Employee 2] was present when Santich ordered [the maintenance employee] to discharge wastewater to the discharge swale on numerous occasions. Sometimes, Santich would give the order directly to [Employee 2] to tell [the maintenance employee] to do it.").)[6] Employee 2 was a "participant."

As for Employee 3, he testified that Santich directed him to pump wastewater up the hill on multiple occasions, described how he could do so, how the valve worked, and the circumstances in which Santich would ask him. But he did claim that he disobeyed the order and sent it to the wastewater storage tanks. Employee 3 said he did not tell Santich that he disobeyed the order because he feared getting fired. (Def. Ex. Z at 9-13, 18-19.) Given the number of other participants, whether the Court credits the claim that he disobeyed the order or whether Santich's attempt to order Employee 3 to pump wastewater renders that employee "a person who is criminally responsible for the commission of the offense" is largely academic. Regardless, it is unambiguously evidence of the extensiveness of Santich's conduct.

Santich's criminal conduct was "otherwise extensive." In making this determination "courts should consider "the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme." *United States v. Arbour*, 559 F.3d 50, 54 (1st Cir. 2009) (citation omitted). "[A]ll persons involved during the course of the entire offense are to be considered. Thus, a [crime] that involved only three participants but used the unknowing services of many outsiders could be considered extensive." *United States v. Dietz*, 950 F.2d 50, 53 (1st Cir. 1991).

---

Yet they consistently reported the nature of Santich's crime, how he managed the company, and the way he treated his workforce.

[6] *See also* Def. Ex. AA ("[Employee 2] wanted to take over [the maintenance employee's] job overseeing discharging the wastewater up the hill because of the extra overtime.").

Here, Santich used outside contractors to build the infrastructure needed to surreptitiously discharge waste into the Souhegan River. This involved using an excavation company to install a secret underground pipe up a hill hundreds of feet behind the facility and a drainage ditch to direct the wastewater from that pipe "approximately 1,140 feet – over three football fields" to the Souhegan River. (Def. Sent. Mem. at 9.) Santich altered the plumbing at the facility, installing a three-way valve and later a manifold, adding a fourth line to more efficiently pump wastewater to the discharge pipe, and installing sumps to automatically pump contaminated stormwater up the hill. (Govt. Sent. Mem. at 6-12.) And Santich used numerous employees to install and wire pumps and switches and to move the wastewater so that it could be illegally dumped. (*E.g.*, PSR ¶ 22; Santich PSR Add. at 3-4, 20.)[7] Whether or not all the employees and contractors involved knew the details or exactly what they were doing, Santich used them for years to move his wastewater where he wanted it to go: the Souhegan River. Santich's efforts to deceive EPA to conceal the offense—and his use of his unwitting environmental consultant and legal counsel to do so—further demonstrate the extensive nature of Santich's crime. (*See* Govt. Sent. Mem. at 12-14.) "These unknowing participants were essential to the crime; without their participation [Santich's] activities could not have happened or continued." *Tuma*, 738 F.3d at 694.

The enhancement applies. For this reason, Santich is also not a zero-point offender.[8] The Court should deny the defendant's objections.

---

[7] *See also* Exs. 11 & 12, Aug. 2, 2023 & Jul. 24, 2024 Employee 2 Interviews.

[8] USSG § 4C1.1(a)(10). Contrary to the defendant's contention, 28 U.S.C. § 994(j) does not exempt white collar defendants from satisfying the prerequisites to be a Zero-Point Offender. (Def. Sent. Mem. at 33-35.) Section 924(j) requires the guidelines reflect the "general appropriateness" of non incarceratory sentences for crimes that are not "an otherwise serious offense." White collar crimes like this, where the defendant organized and led an extensive criminal scheme are "otherwise serious" and appropriately bar the defendant from being a zero-point offender. *Cf. United States v. Starck*, 974 F.2d 1329 (1st Cir. 1992) (describing as "dubious" description of fraud offense where defendant was an organizer leader "as 'not serious'" under § 924(j)).

2. <u>The PSR Correctly Applied a 2-Point Enhancement for Abuse of a Position of Trust</u>

The defendant's challenge to the abuse of trust enchantment is likewise without merit. (Def. Sent. Mem. at 29-32.) The PSR correctly applied this enhancement because the defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." USSG § 3B1.3; PSR ¶ 42A; Santich PSR Add. at 6-7.

"To apply the enhancement, "the district court must first decide that the defendant occupied a position of trust and then find that [he] used that position to facilitate or conceal the offense." *United States v. Sicher*, 576 F.3d 64, 71 (1st Cir. 2009). "[T]here is nothing in § 3B1.3 that requires the government to prove that the defendant's conduct 'victimized' those whose trust he abused in the commission of the crime." *United States v. Wilson*, 887 F. Supp. 2d 341, 344 (D.N.H. 2012) (quoting *United States v. Thomas*, 510 F.3d 714, 726 (7th Cir. 2007)); *see also Sicher*, 576 F.3d at 70 & n.5. Relevant here, this enhancement applies in cases like this where the defendant holds a position of trust with state and federal "agenc[ies that] placed special trust and confidence in the defendant." *United States v. George*, 841 F.3d 55, 67 (1st Cir. 2016). Other circuits have specifically blessed application of the enhancement in Clean Water Act cases. *E.g.*, *United States v. Pruett*, 681 F.3d 232, 249 (5th Cir. 2012).[9]

*Pruett* is instructive. In that case, the defendant "used his position as the president and chief executive officer" of his company to illegally discharge pollutants in violation of the Clean Water Act. The Fifth Circuit affirmed application of the abuse of trust enhancement because the defendant's position as president and CEO of the company "made the criminal conduct easier to perform" and "facilitated his crime." *Id.* at 249. In particular, the defendant "had discretion to

[9] *See also United States v. Snook*, 366 F.3d 439 (7th Cir. 2004); *United States v. Kuhn*, 345 F.3d 431 (6th Cir. 2003).

decide what efforts should be undertaken to comply with his permit obligations" and "was also responsible for overseeing his facilities' treatment and testing systems, as well as for maintaining accurate records." *Id.* As for the EPA, "they depended in large part upon [the defendant] to monitor his own operations" and his abuse of his position "thus facilitated his offenses." *Id.*

As the Probation Officer rightly notes, "the facts of this case are nearly identical to the underlying facts in *Pruett.*" (Santich PSR Add. at 7.) Santich likewise "held a position of private trust as president and chief executive officer" of Old Dutch, *Preuett*, 681 F.3d at 248, as well as "a position of trust vis-à-vis the Environmental Protection Agency as the Team Coordinator with regard to Old Dutch's stormwater permit and Stormwater Pollution Prevention Plan (SWPPP)," (PSR ¶ 42A.) As President, CEO, and SWPPP "Team Coordinator," Santich's position was "characterized by professional or managerial discretion." USSG § 3B1.3 app. n.1. Indeed, Santich controlled "all aspects of the businesses," and "was the sole 'boss'" with "discretion to decide what efforts" his employees and contractors took "to comply with his permit obligations." *Pruett*, 681 F.3d at 249; *see also* Ex. 9 (2021 SWPPP excerpt listing Santich's role and responsibilities); Def. Sent. Mem. at 19 (Santich is "the operator and sole executive in charge of the Company" and "[n]o current employee is equipped to operate the Company without Mr. Santich's involvement").

Santich abused these positions of trust to commit and conceal his crime. As Santich well knew, he was responsible for providing EPA accurate information concerning Old Dutch's compliance with the Clean Water Act, its stormwater permit, and in other enforcement actions. In the face of this, he built an extensive illegal discharge operation, used his power over his employees to get them to operate it, and lied to EPA to conceal his crime and prevent them from metering the amount of wastewater he illegally discharged. (Govt. Sent. Mem. at 6-14; Santich PSR Add. at 6-7.) At the least, this "made the criminal conduct easier to perform" and "facilitated his crime."

*Pruett*, 681 F.3d at 249.

The defendant's attempt to distinguish *Pruett* is misplaced. The defendant asserts that *Pruett* is distinguishable because the defendant in that case owned 28 wastewater facilities, was in the business of wastewater treatment, and went to trial. (Def. Sent. Mem. at 33.) But none of these facts have anything to do with the abuse of trust enhancement. Nor must Santich's crime be specifically listed as an example in the guideline application notes. (*Id.* at 30 (citing app. n.1).)[10] Rather, the question is whether Santich's "position was one of public or private trust and that the position was abused." *United States v. Stella*, 591 F.3d 23, 28 (1st Cir. 2009). It was and he did.

The abuse of trust enhancement applies. The Court should deny the defendant's objection.

**C. <u>A 36-Month Sentence Will Not Result in a Sentencing Disparity</u>**

Contrary to the defendant's assertion, a prison sentence here will not result in an "unwarranted sentencing disparit[y]." 18 U.S.C. § 3553(a)(6); ECF No. 36 at 13-17. "To present '[a] well-founded claim of disparity,' a defendant must compare apples to apples." *United States v. Rosario*, 143 F.4th 41, 48 (1st Cir. 2025) (citation omitted). Put simply, there is no *unwarranted* sentencing disparity "if 'material differences between the defendant and the proposed comparator suffice to explain the divergence.'" *Id.* (citation omitted).

For reasons discussed already in the government's sentencing memorandum, this is not a run of the mill environmental crime case. (Govt. Sent. Mem. at 3-19.) In sentencing, the Court may "distinguish[] the defendant's particular circumstances from the ordinary offense covered by the guidelines" and should "direct[] individualized attention to the defendant's case." *United States v. Burgos*, 133 F.4th 183, 193 (1st Cir. 2025) (citation omitted). Even so, comparable cases are

[10] To the contrary, the application notes make clear the enhancement applies when, as here, the defendant is "subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature" and the position "contributed in some significant way to facilitating the commission or concealment of the offense." USSG § 3B1.3 app n.1.

useful. Santich's crime is like that of the defendant in *United States v Tuma*. In that case, the Fifth Circuit affirmed a 60-month sentence after trial for a defendant who engaged in scheme to have his employees discharge tanks of wastewater illegally day and night to POTW and into a river. Like Santich: (i) he committed the crime for economic reasons; (ii) installed illicit pipe; (iii) lied to the contractor performing pipe work; (iv) used employees to conceal the crime by washing away evidence of the discharge with dish detergent; and (v) deceived City and EPA inspectors by providing inconsistent information and lying about his operations. 738 F.3d at 685-87. Even accepting the defendants' harm argument, in *Tuma* there was no direct, specific evidence of environmental harm.

In other environmental crimes cases that involved false statements (though not the same level of dishonesty as in this case), courts have regularly sentenced defendants to prison. *E.g.*, *United States v. Hong*, 242 F. 3d 528 (4th Cir. 2001) (36 months for multiple negligent Clean Water Act violations where de facto business owner discharged untreated wastewater to treatment system knowing that the treatment system was ineffective and after telling authorities he did not discharge); *United States v. Opare-Addo*, 486 F.3d 414 (8th Cir. 2007) (30 months for owner and 26 months for manager where there was no direct evidence of contamination of Mississippi River and where defendants bypassed treatment system and used hoses to discharge untreated waste to sewer system; fired employee who objected; and deceived inspectors by diluting waste stream and adding dye to make water look clean).[11]

The cases cited by the defendant are fundamentally different. Most notably, each lacks the same pattern of deception. Several of their cases involve negligent discharges or reporting that resulted in misdemeanor charges (*U.S. v Drake*, *U.S. v Bass*, *U.S. v. Lamara* (*Saunders Asbestos*),

[11] For additional cases see Appendix A.

and *U.S. v. Meyer*);[12] two involve misdemeanors resulting from a single event that caused substantial environmental harm (*U.S. v. Hill*, *U.S. v. McKissick*). One case involves a single knowing discharge by an employee who lost his job as a result of the discharge (*U.S. v. Garrity)*; others involve conduct by municipal employees or lower-level corporate employees with no personal profit motive (*U.S. v. Williamson*, *U.S. v. Beaudoin & Lawrence*); and some involve discharges to a POTW not directly into a river or other water of the United States (*U.S. v. Wells, U.S. v Bass, U.S. v. McGlory, U.S. v. Cellamare, U.S. v. Faria*).[13] Finally, Santich cites civil cases brought by Blue Water Baltimore and the State of Maryland involving discharges to a stream by Fleishmann Vinegar that resulted in a fish kill, apparently to illustrate the use of civil rather than criminal enforcement. But the defendants in those cases did not have a lengthy history of noncompliance, did not know about the discharges, and there was no a scheme to deceive. In any event, Santich and Old Dutch are no strangers to civil enforcement and committed the crime here, in part, to evade that enforcement.

In short, none of the cases cited by the defendant is like this one. This is a rare case where the defendant engaged in nearly every aggravating factor that courts might consider in weighing the 3553 factors in sentencing environmental crimes.[14] None of the defendant's cases involved

---

[12] The docket number for *U.S. v. Meyer* is 3:09-cr-133 (D. Ct. Oct. 15, 2009).

[13] While *McGlory* and *Cellamare* involved false submissions, neither defendant engaged in the long pattern of noncompliance, deception, and falsehoods present here.

[14] Such factors may include: (i) whether the violation was negligent or knowing; (ii) whether the violation was a one-time discharge event or happened repeatedly; (iii) the defendant's position with the company and role in enlisting others; (iv) whether the discharge was unpermitted or governed by a permit; (v) whether the discharge was to a POTW or directly to the water; (vi) whether the defendant was motivated by personal profit; (vii) whether, aside from the violations, there had been long-term, legitimate corporate-wide environmental compliance, including the expenditure of significant resources on treatment systems; (viii) whether the defendant immediately resolved the noncompliance; (ix) whether the defendant had been subject to previous enforcement actions evidencing deliberate malfeasance and recalcitrance; (x) the harm to the environment and/or the regulatory programs due to defendant's conduct; (xi) whether the defendant submitted false documents in connection with the violations; and (xii) whether the defendant otherwise engaged in a pattern of deception and knowing falsehoods, and for how long.

extensive efforts to build an illegal discharge infrastructure, conscripting multiple employees and contractors to commit the crime, and years-long pattern of fraud, dishonesty and Clean Water Act violations that continued after the defendant was caught.

Considering the nature of *this* offense compared to other criminal environmental cases, a 36-month sentence is appropriate and would not result in a sentencing disparity, much less an unwarranted one. The Court should reject the defendant's disparity argument.

### D. <u>$2 Million in Financial Penalties is Appropriate and Reasonable</u>

The defendants request that the court allow Old Dutch to pay its $1.5 million fine in monthly installments during its five-year term of probation. The government agrees that some type of installment plan could be helpful to ensure that Old Dutch remain solvent and that it devotes appropriate resources toward compliance. However, the government requests that the Court order Old Dutch to pay half of its fine at or within 30 days after sentencing with the remainder to be paid in monthly installments during its term of Probation. A significant upfront payment is important to serve the purposes of sentencing, particularly given the nature of the offense and to deter the company and others from engaging in this type of criminal conduct. In addition, Santich and Old Dutch pleaded guilty to a binding plea that included a $1.5 million fine more than a year ago. The company has had ample time to financially prepare to pay the agreed-upon fine.

Since filing their initial sentencing memoranda, the parties have agreed that the Court should impose a fine against Santich in lieu of the agreed-to forfeiture money judgment. The parties disagree, however, as to the amount of the fine. The government requests that the Court impose a $500,000 fine. Based on the defendants' conservative forfeiture analysis (Def. Ex. AB), Santich admits that on at least 97 days, he illegally discharged pollutants up the hill rather than shipping the wastewater off site. This alone would result in a maximum fine of $4,850,000

($50,000 per day for 97 days.)[15] Given the evidence discussed already—including that Santich directed his employees to pump on weekends, holidays and at night (sometimes all night); that wastewater would sometimes flow all day through "Line Four"; and that by 2021 Santich plumbed the outdoor sumps to automatically pump up the hill—this underestimates the extent of the illegal discharges and the defendants' gain. (*E.g.*, Govt. Sent. Mem. at 8, 11, 23; Exs. 11 & 12.)[16]

A $500,000 fine is necessary to partially divest Santich of his ill-gotten gains and is appropriate and reasonable. The government respectfully requests that the Court impose it.

### E. <u>A Below-Guideline Sentence is Not Warranted</u>

For these reasons and those stated in the government's sentencing memorandum, a below-guideline sentence is not appropriate in this case. The government acknowledges that the defendant accepted responsibility and pleaded guilty pre-indictment. It is also significant that Santich agreed to a robust statement of the offense conduct that goes beyond the bare bones needed to satisfy the elements of the offense. Because of this—despite the nature of his offense, Santich's persistent dishonesty, and his ongoing Clean Water Act violations—the government is not arguing that the defendant has failed to accept responsibility or that other guideline enhancements apply. But Santich's guilty plea does not change the facts or what he did. The nature of his criminal conduct, his efforts to cover it up, and his continuing Clean Water Act violations after pleading guilty

---

[15] The PSR calculates Santich's maximum fine to be $64 million based on his years long continuing violation of the Clean Water Act. (Santich PSR ¶ 81.) In his forfeiture analysis, Santich admits to avoiding at least 292 shipments from January 1, 2020, to December 31, 2024. The available shipment data indicates that sometimes (particularly during the earlier years) ODM shipped one truckload each weekday. At other times (particularly during the later years), ODM shipped three truckloads per weekday. Conservatively using the three loads per day (thereby minimizing the days of violation), 292 shipments avoided amounts to 97 days of violation (292 shipments/three shipments per day).

[16] Santich's forfeiture analysis calculates a minimal amount of his crime proceeds. It begins in 2020, three years after the discharges began in 2017, does not fully account for the extent (and variability) of Old Dutch's daily production, the amount of wastewater generated during production, the number of spills and other unexpected influxes of wastewater, the amount of rainfall flowing over the tank farm and other pH-laden areas of the facility, and, importantly, the volume pumped through the sumps and "Line Four."

evidence a lack of remorse that must be reflected in his sentence.

Santich took extraordinary efforts to impede EPA and NHDES's efforts to bring his company into compliance, built an extensive infrastructure to illegally discharge his waste, conscripted his employees to run it, and lied to EPA and others to cover it up. Had the defendant accepted responsibility immediately after he was caught, this could be a different case. But he did not. Santich dug in and lied (and had others repeat that lie) to try to convince criminal investigators that it was just a failed attempt at growing mustard plants. A variance is not warranted.

## II. CONCLUSION

The United States respectfully requests that the Court deny the defendant's PSR objections and motion for a departure and/or variance and (i) impose a guideline sentence of 36 months imprisonment and a $500,000 fine for Charles Santich; and (ii) sentence Old Dutch Mustard to five years' probation, with a condition that it establish an effective environmental compliance program and environmental ethics program, and impose a $1.5 million fine.

Dated: April 6, 2026

Respectfully submitted,

ERIN CREEGAN
United States Attorney

By:/s/ Matthew T. Hunter
Matthew T. Hunter
Assistant United States Attorney
53 Pleasant St., 4th Floor
Concord, NH 03301
Matthew.Hunter@usdoj.gov

/s/ Richard J. Powers
Richard J. Powers
Senior Trial Attorney
Environmental Crimes Section
150 M Street N.E., Room 4.107
Washington, D.C. 20002
richard.j.powers@usdoj.gov