UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA

v.

CHARLES SANTICH and

OLD DUTCH MUSTARD CO., INC., d/b/a PILGRIM FOODS, INC.

Defendants.

Criminal No. 1:25-cr-00002-LM-TSM-01/02

**DEFENDANTS' RESPONSE TO GOVERNMENT'S SENTENCING POSITION**

The Government's request for a three-year term of imprisonment for Mr. Santich, the most severe under the pertinent statute, and total combined fines of $2 million for Mr. Santich ($500,000) and the Company ($1.5 million): (1) is greater than necessary to achieve the purposes of sentencing, (2) prohibitively restricts Mr. Santich's ability to abide by and implement the recommendations of an independent engineering firm to direct the Company into proper compliance, set forth by the Administrative Order for Compliance on Consent ("AOC") and the Environmental Compliance Program ("ECP") within the Plea Agreement, and (3) all but ensures the closure of a nearly century-old business that employs over 60 people.

A scratch below the surface of the Government's Sentencing Position reveals a pattern of overreach: a series of misconstrued facts built upon questionable witnesses, all designed to overinflate Mr. Santich's sentence of incarceration despite his and the Company's full acceptance of responsibility for their actions. Although the Government states that the "goal of criminal

financial penalties is not to shut down the business,"[1] its actions suggest otherwise. The inescapable conclusion is that the Government seeks not just punishment, but the effective destruction of a long-standing family-owned business and income to more than 60 families, vendors, and the related local jobs it supports, in drastic opposition to the goals and consideration of 18 U.S. Code § 3553.

Below, Mr. Santich and the Company present their response and clarifications to the Government's inaccuracies, exaggerations, and mischaracterizations included in its Sentencing Position.

**The Government's Sentencing Position Is Built on Overreach and Mischaracterization.**

Throughout its Sentencing Position, the Government so embellishes its narrative concerning Mr. Santich's conduct that the defense can only assume the Government's aim is to generate the maximum imprisonment for Mr. Santich, leading to the closure of his business. Despite accusing the Company of a "decade's long history of undeterred pollution of New Hampshire's waterways,"[2] the instant case is the first and only criminal matter brought against the Company in its history. Mischaracterizing the environmental challenges faced by a nearly century-old manufacturing business as "undeterred pollution" ignores that the Company has gone to great lengths to improve compliance and maintain regular communication with its regulators.

Indeed, the Company has an imperfect environmental history – a fact it shares with many other manufacturing facilities working to preserve and produce American-made products and local jobs despite aging infrastructure built prior to the 1972 enactment of the Clean Water Act

---

[1] *See* United States Sentencing Memorandum, 24, ECF No. 35.
[2] *Id.* at 3.

("CWA"). In one sense, the Government is correct that the facility was "old and leaky,"[3] a problem that led to many of the historic issues faced by Old Dutch. Additionally, the Company's facility is situated directly over the Unnamed Brook, further complicating environmental compliance. However, notwithstanding the conduct of Mr. Santich and the Company admitted to in their plea agreements, the Company entered a new era in 2014 when Mr. Santich became President, and since then has undertaken costly and cumbersome efforts to modernize the facility including replacing old, leaky wooden tanks with fiberglass and stainless steel, improve piping throughout the facility, and implementing electronic controls for the production and wastewater handling – all at great cost to the Company.

The Government's repeated characterization that Mr. Santich had wastewater "pumped directly" into the Souhegan River is a factual mischaracterization of Mr. Santich's actions.[4] As is well documented, when the discharge pipe was ultimately extended in 2017, it was separated by 1,140 feet – over three football fields – from the Souhegan River.[5] Mr. Santich indeed pleaded guilty to wastewater discharge eventually entering the Souhegan River, but to characterize his actions as depositing wastewater "directly" into the river is not accurate and misinforms any concept of Mr. Santich's *mens rea* as applicable to the conduct for which he pleaded guilty. Moreover, the Government selectively presents photos to the Court that imply a steady pathway of water to the river, leaving out photos of other parts of the railroad bed which show portions that are flat in nature where water coming from the pipe could appear in stagnant puddles or

---

[3] *Id.*
[4] *See* United States Sentencing Memorandum, at 17, 20, ECF No. 35. ("Santich built the infrastructure needed to secretly pump and dump his manufacturing waste directly into the Souhegan River."); ("Periodic spikes of acidic wastewater pumped directly into the Souhegan River . . .").
[5] *See* Ex. V to Defendant's Memorandum in Aid of Sentencing at 15, Expert Opinion Report of Dr. Paul R. Krause Regarding the Impact of Discharges of Acidic Wastewater to the Souhegan River, (December 2025), ECF No. 36.

where it proceeded down a natural cascade to a diffused and varied delta. *See below* two additional images taken on August 2, 2023:






The Company and Mr. Santich acknowledge and have accepted responsibility for their actions to discharge low pH water from the discharge pipe that in certain instances did flow to the Souhegan River, but the Government's selected photos do not reflect the full reality of the landscape between the discharge pipe and the Souhegan River, 1,140 feet away.[6]

The plea agreements entered by Mr. Santich and the Company offer a good starting point for this discussion. Importantly, Count One of the Information, which represents the focus of the criminal charges, alleges conduct from January 2020 through August 2023, after which the pipe

---

[6] The wastewater at issue in this case is from the manufacturing process at Old Dutch, not sanitary waste or sewage. *See* n. 1, ECF No. 2.

up the hill was disconnected and capped and not used since then.[7] Nevertheless, the Government cites to citizens' complaints from the 1980s about vinegar odors in the Souhegan River, decades before Mr. Santich took over a leadership role at the Company. The Government also intentionally blurs the lines between the illegal pipe up the hill and the compliance challenges associated with the Unnamed Brook on the opposite end of the property that have existed for decades and involve challenging issues with ground and storm water runoff.

Consistent with this tactic, the Government alleges that Mr. Santich received a competitive advantage "over those around the country who spend the resources needed to properly dispose of their manufacturing waste."[8] Old Dutch has several competitors located in various parts of the country like Wisconsin, Ohio, and upstate New York. Had the Government looked into the conditions for those competitors, they would have learned many of the benefits they have that Old Dutch does not, like (1) lower negotiated utilities costs; and (2) direct links to local municipalities' wastewater treatment centers. Further, the analysis of the transported truck loads of low pH wastewater from Old Dutch to Rochester, NH before and after the discharge pipe was disconnected and capped in August 2023 reveals that the Company only saved an estimated total of $194,536.34 through the use of the discharge pipe, an annual increase of less than $50,000, hardly impactful to the business.[9] The facts and circumstances show that the challenges faced by Old Dutch center on capacity for storage of the low pH wastewater[10] not some unresearched allegations by the Government for competitive advantage.

---

[7] *See* Information, ¶ 31, ECF No.1.
[8] *See* United States Sentencing Memorandum, 20, ECF No. 35.
[9] *See* Ex. AB to Defendant's Memorandum in Aid of Sentencing, Letter from Mark Lytle to AUSA Matt Hunter Regarding Forfeiture (Dec. 19, 2025), ECF No. 36.
[10] *See* Ex. A, Old Dutch Response to Request for Information Dated March 20, 2025 (CWA-308-R01-FY25-22) and Re-issue of such Request for Information dated May 22, 2025 ("At the time of these low pH events, the 3,500-gallon wastewater pumphouse tank was offline for mechanical and control-related improvements, including concrete and fiberglass resurfacing work, integration of an electronic monitoring system and installation of new upgraded pumps. The goal of the improvements was to enhance operational control and to further environmental compliance. The

## I. The Government Falsely Claims That Illegal Discharges Continue Today.

Perhaps the most egregious example of the Government's overreach is its effort to conflate intentional discharges through the pipe up the hill for which Mr. Santich and the Company pleaded guilty with sporadic low pH readings in the Unnamed Brook. Since August 2023, no wastewater has been pumped through the illegal discharge pipe that formed the basis of the criminal conduct to which Mr. Santich pleaded guilty. The Government provides no evidence whatsoever to the contrary.

What the Government conflates with continuing illegal discharges are in fact the ongoing challenges of operating a historic manufacturing facility with aging infrastructure – the very challenges that Mr. Santich and the Company entered into the AOC to address. Low pH readings observed in the Unnamed Brook are not evidence of willful criminal conduct; they are the predictable consequences of historic contamination at a nearly 100-year-old facility, and they are the very issues the AOC was designed to address over the course of a full year, not overnight. Specifically, the AOC calls for plans for environmental and engineering investigations and recommendations to be submitted in September 2026.[11]

The Government's failure to mention the AOC even once within its Sentencing Position is telling. The AOC was entered into on January 17, 2025, and incorporated by reference in an Environmental Compliance Program ("ECP"), which the Company and Mr. Santich have agreed to implement as part of their Plea Agreements.[12] The AOC was purposely designed to address

---

work involved coordinating electricians, plumbers, Pilgrim information technology, and its alarm company, Monadnock Security Systems. During this period, instead of flowing to the 3,500-gallon tank, liquid flowed directly to the 1,800-gallon tank within the wastewater pumphouse before being pumped to the 31,000-gallon wastewater storage tank.").

[11] *See* Plea Agreement as to Old Dutch, at 31-63 (Ex. 1 to Environmental Compliance Program and Environmental Ethics Program), ECF No. 3.

[12] *Id.*

and remediate issues involving low pH discharge at the Company over a period of one year – not overnight. Pursuant to the AOC, an independent environmental and engineering expert is conducting a year-long investigation of the Company's facility and compliance challenges. The investigation will lead to a final report and recommendations for required infrastructure and/or process improvements to achieve CWA compliance. This commitment comes at a considerable cost to the Company – costs projected for the investigation/recommendations is approximately $867,600, plus, the likely considerable costs of infrastructure improvements that will be required following the expert's recommendations. Characterizing readings observed during the early stages of a long-term compliance improvement program as willful conduct demonstrates a continued effort to conflate Mr. Santich's admitted criminal conduct and the Company's operational challenges that the Company and Mr. Santich have already committed to fixing.[13]

## II. The January 2025 Discharges Were Caused by Equipment Failure, Not Willful Misconduct.

The Government references "at least four acidic discharges" made by the Company on January 20–22 and 27, 2025, shortly after signing the Plea Agreement, and claims defendants "provided the EPA with incomplete and contradictory explanations of these discharges."[14] This characterization is misleading and ignores the documented facts.

As the facility is designed, process wastewater and stormwater that accumulates in the facility's tank farm flow to two staging tanks in the "pumphouse," before that liquid is pumped to larger storage tanks. Liquid is then loaded from the larger storage tanks into tanker trucks and shipped offsite for disposal to the Rochester, NH Publicly Owned Treatment Works ("POTW").

[13] March 14, 2025 Letter. from SCS Engineers to Mr. Charles Santich and Old Dutch re: Proposal for Facility Engineering Evaluation, Environmental Assessment and Investigation, and Comprehensive Compliance Plan, Greenville, NH Facility.
[14] *See* United States Sentencing Memorandum, 14, ECF No. 35.

The January 2025 events occurred when process water overtopped from one of the staging tanks in the wastewater "pumphouse," while the second, larger staging tank was offline for improvements. The Company initially understood this backup to be caused by a lack of capacity in the larger wastewater storage tanks, as the events coincided with a federal holiday and a period in which the Company's wastewater trucking company experienced truck maintenance issues and sick personnel, resulting in the cancellation of several planned wastewater pickups.

What the Government fails to acknowledge is that the process of locating and diagnosing the cause of low pH readings in the Unnamed Brook requires an investigation at the facility that occurs over days and weeks. The Company ultimately determined that capacity in the larger wastewater storage tanks did not cause the staging tank in the pumphouse to overflow. Rather, wastewater flowed to the staging tank too rapidly for the pump in the tank to effectively convey the liquid to the larger storage tanks. The problem was exacerbated by the fact that the second larger staging tank in the pumphouse was offline for improvements during this time. The Company's ultimate explanation for the cause of the overtopping was not "in tension" with its initial response but rather reflects new information that came to light through continued investigation and problem solving.

In the months that followed these events, the Company: (1) completed concrete work and fiberglass resurfacing of the second staging tank in the pumphouse and brought it back online; (2) upgraded the pumps in both tanks from ½ horse power pumps to 1 horse power stainless steel pumps; (3) made improvements to a Programmable Logic Controller ("PLC") system and monitoring floats to monitor liquid level in the pumphouse staging tanks and trigger additional pumps when water level rises; and (4) resealed the pumphouse floor to minimize the potential for any seepage of liquid through the floor if an overtopping event were to occur again. Since these

improvements were completed in April 2025, the Company has not experienced similar overtopping challenges. These are not the actions of a company "thumbing its nose" at compliance; they are the actions of a company working in good faith under extraordinary regulatory scrutiny to address operational challenges at an aging facility.[15]

### III. The Culvert Repair Was Documented, Necessary, and Delayed Only by Government Bureaucracy.

In discussing post-plea conduct, the Government references a November 6, 2025 Notice of Violation from the EPA associated with the Company's efforts to repair a culvert in the Unnamed Brook using Quikrete Hydraulic Cement.[16] Yet again, what the Government portrays as a "gotcha" moment is really just an excuse to misconstrue the record and further mischaracterize the facts.

The Company had been attempting to address infiltration of groundwater impacted by historic residuals into the culvert for over a year before the repair work at issue. The Company believes the infiltration of such groundwater contributes to low pH events in the Unnamed Brook. As early as August 7, 2024, the Company contacted the U.S. Environmental Protection Agency, Region I to communicate its concern that historic residuals infiltrating the culvert were likely the source of low pH events.[17] The Company's environmental counsel at Verrill Dana, LLP documented the Company's predicament on October 31, 2025: "Pilgrim has, for more than a year, been determined to resolve and address what it believes to be the infiltration of historic residuals into CBY17 and the unnamed brook culvert."[18] Counsel further explained that "[t]he

---

[15] *See* Ex. A, Old Dutch Response to Request for Information Dated March 20, 2025 (CWA-308-R01-FY25-22) and Re-issue of such Request for Information dated May 22, 2025.
[16] *See* United States Sentencing Memorandum, 15, ECF No. 35.
[17] *See* Ex. B, Letter from Verrill Dana, LLP to U.S. EPA Regarding Response to 308 Request Docket No. CWA-308-R01-FY26-04 (Oct. 31, 2025).
[18] *Id.*

Company is therefore faced with the predicament of needing to immediately and expeditiously address ongoing discharge of low pH material, but while also grappling with the long timelines associated with a comprehensive environmental and engineering investigation process."[19]

Despite repeated attempts to receive approval or responsive dialogue from the EPA or NHDES, related to the culvert repairs, the Company's inquiries were met with silence. The Company's consultant, CGL Consulting, contacted NHDES on July 30, 2025, requesting guidance on next steps for the culvert repairs, and received no response. A follow-up request was sent on August 8, 2025 – again, no response.[20] The Company raised the topic again during EPA's facility visit on September 22, 2025, and reiterated the request for a substantive discussion on how best to move forward.[21] The Company re-circulated a camera survey of the culvert on October 6, 2025 – again, no response.

When the Company finally received guidance from the New Hampshire Department of Justice and the New Hampshire Department of Environmental Services on October 20, 2025, it was after nearly three months of attempting to coordinate with the agencies. The culvert work could only be completed during the dry season when there was low flow; if the work were not completed promptly, it would likely have had to wait until summer or fall 2026.

Faced with this impossible situation – ongoing low pH events caused by the very culvert that needed repair, a compliance obligation to address those events, and complete silence from the agencies whose approval was needed – the Company moved forward with repairs above the waterline, consistent with past practice of informal coordination with NHDES, in late September

---

[19] *Id.* at 2.
[20] *Id.* at 3.
[21] *Id.*

and early October 2025. The Company took precautions during the repair work: a wheelbarrow was placed beneath each work area to catch debris, the Quikrete material was allowed to set within three to five minutes per manufacturer specifications, and all materials were immediately removed from the culvert following each work session. Personnel were specifically instructed of the critical importance of ensuring that no Quikrete material made its way into the Unnamed Brook.

That some cement dust nonetheless entered the water during the repair process is unfortunate. However, the Government cannot simultaneously demand compliance and then refuse to engage with the Company's repeated requests for guidance on how to achieve it.

## IV. Trucking Wastewater to Rochester Is a Legitimate and Cost-Effective Business Decision.

Without adequate support, the Government criticizes the Company's wastewater shipping program to the Rochester, New Hampshire POTW, asserting that Mr. Santich "chose the least expensive, but also the least sustainable, option: trucking wastewater offsite."[22] Once again, the Government overextends itself to paint Mr. Santich in a negative light when the record supports the legitimacy of this approach.

Trucking wastewater to an alternate treatment and disposal facility was listed as one of three "effective" options for handing facility wastewater within the Lagoon Decommissioning Feasibility Study prepared by Sanborn, Head & Associates, Inc. in October 2010.[23] This was not a decision made in secret or in defiance of regulators; it was a decision consistent with expert recommendations. The 2010 Feasibility Study analyzed multiple wastewater management

[22] *See* United States Sentencing Memorandum, 24, ECF No. 35.
[23] *See* Ex. C, Lagoon Decommissioning Feasibility Study, Sanborn, Head & Associates, Inc. (October 2010).

options, and their associated 30-year net present worth cost estimates, including: transport/discharge to an alternate treatment facility ($2,800,000); on-site treatment for reuse and/or direct discharge to POTW ($3,100,000); and wastewater reuse for on-site irrigation ($3,600,000). The transport option had the lowest *initial* capital cost estimate of approximately $100,000, compared to $1,500,000 for on-site treatment and $2,500,000 for on-site irrigation, but would only represent estimated savings of 25% over 30 years when compared to the most expensive option. Moreover, there is simply no basis for the Government's contention that the transport option was the "least sustainable" option or that the other options "would have better managed wastewater over time."[24]

Furthermore, the Company's relationship with the Rochester POTW was formulated through a New Hampshire DES employee, Wes Ripple, who learned that Rochester's POTW could benefit from the Company's wastewater to address a nitrogen problem within its facility. This was a mutually beneficial arrangement supported by the Government, not a scheme to avoid compliance. The Government's suggestion that Mr. Santich should have chosen a more expensive option ignores the economic realities of operating a small, family-owned manufacturing business and improperly second-guesses legitimate business judgment. Moreover, the Government completely ignores the mutual benefits conveyed upon the Rochester, NH POTW, who regularly receives the low pH water from Old Dutch.[25] By using Old Dutch's waste water to reduce nitrogen levels in the Great Bay, the city of Rochester acknowledged that, at least in 2016 dollars, the city could have saved approximately $25 million in costly upgrades

[24] *See* United States Sentencing Memorandum, 24, ECF No. 35.
[25] *See* Ex. D, Liz Markhlevskaya, Rochester using 'pickle juice' to reduce nitrogen, Foster's Daily Democrat (December 30, 2016), https://www.fosters.com/story/news/environment/2016/12/30/rochester-using-pickle-juice-to-reduce-nitrogen/22944851007/.

to its system due to the cost-free receipt of Old Dutch's low pH wastewater.[26] Thus, Rochester saved $25 million in costs that did not have to be passed on to the users of the city's sewage system.[27] In December 2016, the local news media lauded the solution:

> About two years ago, the city began implementing acetic acid in its wastewater treatment plant. This substance, similar to pickle juice, is a byproduct of Pilgrim Foods, a food manufacturing company based in Greenville, N.H. Each week, the company ships thousands of gallons of the acid to Rochester at no charge. In turn, the city uses the substance to denitrify the water being released into the Cocheco River through its wastewater treatment plant.[28]

"Through very little money we have been able to reduce that (nitrogen discharge level) by about 80 percent," according to John Storer, the then Director of Public Works for the city of Rochester.[29] This arrangement was and continues to be celebrated, all while under the watchful eye of the EPA in consideration of the permit process for the city of Rochester. The irony should not be lost with the Government now second-guessing Old Dutch's independent consultant-based decision to transport its low pH wastewater to Rochester.

It is not the Government's role to micromanage the business decisions of a private company – a principle the Government itself acknowledges when it states that "[i]t is not government's role to micromanage industry."[30] Yet the Government does precisely that by criticizing the Company's lawful choice of a wastewater management option identified by independent engineers.

---

[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *See* United States Sentencing Memorandum, 20, ECF No. 35.

### V. The Government Relies on Incredible Witnesses to Build Its Case.

Riddled throughout the Government's Sentencing Position are references to employee statements and opinions upon which the Government attempts to build its most compelling case for enhancement against Mr. Santich. These employee statements are derived almost exclusively from former employees terminated by Mr. Santich and the Company for numerous reasons, including violations of Company policy. The Government accepted Mr. Santich's guilty plea and then continued to build a house of cards of unnecessary enhancements based on statements from individuals who already had an axe to grind against Mr. Santich and the Company.

Of particular note is the Government's reliance on former employee Brett Souther, as demonstrated by the seven interviews with Mr. Souther provided in discovery. Among his criminal history, Mr. Souther pleaded guilty to charges of (1) Issuing a Bad Check in 2010 and (2) Theft by Deception in 2011.[31] The Government attempts to build its case for alleging repetitive violations by Mr. Santich and the Company on unreliable witnesses. In this regard, the Government fully ignores the much more reliable measurement available to it – an analysis of the trucking data both before and after the pipe up the hill being capped in August 2023.[32] The Court should evaluate the credibility issues associated with Mr. Souther's convictions and call into question the veracity of his statements to the Government when much more reliable information is available to measure Mr. Santich's actions.

As the Government is well aware based on interviews with numerous witnesses, Mr. Santich's low pH water discharge up the hill was done on an intermittent, but not persistent,

[31] *See* Ex. E, Public/Conviction Only Criminal Record of Brett E. Souther, State of New Hampshire, Department of Safety, Division of State Police (April 3, 2026).
[32] *See* Ex. AB to Defendant's Memorandum in Aid of Sentencing, Letter from Mark Lytle to AUSA Matt Hunter Regarding Forfeiture (Dec. 19, 2025), ECF No. 36.

basis. To suggest otherwise misconstrues the records. In several interviews, former employee witnesses noted that discharge up the hill only occurred when dramatic weather impacted the facility and overwhelmed its wastewater management. Although employees like Brett Souther and August Greer had nearly zero awareness of the challenges facing Mr. Santich and the business, they were well aware that sudden influxes of water from storms or snow melt brought significant challenges. ("On one occasion, Horgan responded to a wastewater alarm after a heavy snow melt to send wastewater up the discharge pipe;")[33] ("…however things got extremely bad in the late winter early spring of 2023. During that timeframe, there was heavy snow late in the season. When it rained or there was a snow melt, the water would mix with the vinegar that was saturated in the tank farm (because of numerous spills and leaks that occurred there) and drain into sump or seep through the walls into the lower manhole. This would cause excess wastewater and on many occasions was pumped out the illegal discharge pipe to the river;")[34] ("When there was heavy rain, the tank farm would overflow.")[35]

## VI. The Government's Proposed Sentence Is Designed to Shut Down the Business.

Despite the Government's hollow assurance that it does not seek to shut down Old Dutch, the practical effect of its proposed sentence would accomplish precisely that. Imprisoning Mr. Santich – the only individual capable of operating the Company – for three years, while simultaneously imposing over $2 million in fines on a struggling family business, is a recipe for closure. The loss of over 60 jobs in a small, rural New Hampshire community would be a

---

[33] *See* Ex. X to Defendant's Memorandum in Aid of Sentencing, May 7, 2024 Interview of B. Souther, USAONH-00004610.
[34] *See* Ex. F, April 22, 2024 Interview of B. Souther, USAONH-00004393.
[35] *See* Ex. G, April 23, 2024, Interview of A. Greer, USAONH-00004589.

devastating consequence wholly disproportionate to the offense conduct. There is also the fact that Old Dutch is the largest taxpayer in Greenville, NH.

The Government's failure to mention the AOC even once within its Sentencing Position, and its similar disregard for the significant work performed by the Company as part of the AOC over the past year, is telling. If the Government truly wanted the Company to survive and come into compliance, it would recognize that Mr. Santich's continued presence at the helm of the Company – under strict probationary conditions – is essential to achieving that goal.

## VII. Conclusion

Mr. Santich and the Company have fully accepted responsibility for the criminal conduct of discharging low pH water through a pipe installed up the hill at the facility. However, there is no other criminal conduct, and the Government has overstated actions related to the Unnamed Brook for maximum effect on the Court. And the discharges through the pipe up the hill stopped in August 2023. There was no lasting harm on the environment through the discharge of low pH water. No mediation or cleanup has been required. The USSG Guidelines calculations in the PSR have overstated the culpability of Mr. Santich. Further, an analysis of the factors set forth in 18 U.S.C. § 3553 supports the recommendation of the following sentence for the Defendants:

(1) for Charles Santich, a sentence of five years of probation with special conditions that require Mr. Santich to take all steps necessary to operate and direct the Company to implement an: (A) effective Environmental Compliance Program ("ECP"); (B) Environmental Ethics Program ("EEP"); and (C) to comply with the requirements contained in the Administrative Order for Compliance on Consent ("AOC"); (D) pursuant to an agreement with the Government, pay a fine in the range of between $194,536.34 and $500,000, which can be paid in equal

installments over five years pursuant to Title 18, United States Code, § 3572(d)(1), and applied to the implementation of the compliance programs listed above.

(2) for the Company, a sentence of five years of probation with the same special conditions listed above as proposed for Mr. Santich; pay a fine of $1.5 million, which can be paid in equal installments over five years pursuant to Title 18, United States Code, § 3572(d)(1), and applied to the implementation of the compliance programs listed above.

The Court should reject the Government's exaggerated narrative and impose a sentence that is truly sufficient but not greater than necessary to achieve the purposes of sentencing.

Date: April 6, 2026

Respectfully Submitted,
**NIXON PEABODY LLP**

*/s/ Nathan P. Warecki*

Nathan P. Warecki (NH Bar No. 20503)
900 Elm Street, 14th Floor
Manchester, NH 03101
Telephone: (603) 628-4077
dnwarecki@nixonpeabody.com

Mark D. Lytle (admitted *pro hac vice*)
799 9th Street NW, Suite 500
Washington, DC 20001
Telephone: (202) 585-8000
mlytle@nixonpeabody.com

Mathew Todaro
VERRILL DANA, LLP
1 Portland Square, Floor 10
Portland, Maine 04101
mtodaro@verrill-law.com

**CERTIFICATE OF SERVICE**

I, Nathan P. Warecki, hereby certify that a copy of the foregoing was filed electronically and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

Dated: April 6, 2026

*/s/ Nathan P. Warecki*
Nathan P. Warecki